**Otis LEE et al., Plaintiffs,**

**v.**

**Stanley R. RESOR, individually, and as Secretary of the Army, Department of the Army, Washington, D. C. 20314, et al., Defendants.**

**George C. MEIERDIERCK, a resident property owner, commercial fisherman, fishcamp operator and citizen of Putnam County, Florida, for himself individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**Emmett C. LEE, Jr., District Engineer, United States Corps of Engineers, et al., Defendants.**

**Nos. 72–382–Civ–J–S, 72–385–Civ–J–S.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Sept. 14, 1972.

No. 72–385–Civ–J–S:

Ronald E. Clark and Jackson Bryan, Palatka, Fla., for plaintiffs.

Harvey E. Schlesinger, John D. Roberts, Asst. U. S. Attys., Jacksonville, Fla., for defendants.

## ORDER AND OPINION

CHARLES R. SCOTT, District Judge.

Plaintiff, George C. Meierdierck, a commercial fisherman and owner of a fish camp on the St. Johns River in Putnam County, Florida, was granted a temporary injunction in Florida state circuit Court restraining the defendant, United States Army Corps of Engineers (Corps) from spraying water hyacinths (Eichhornia Crassipes) with the herbicide 2–4D (2, 4–Dichlorophenoxyacetic Acid). Upon petition of the United States Attorney for the Middle District of Florida the case was removed to this Court on motion for a preliminary injunction, as a civil action against federal officers. 28 U.S.C. § 1442(a)(1).

Consolidated with this case was an action by the owners of seven fish camps along the St. Johns River also seeking to enjoin the Corps from spraying hyacinths on the river with 2–4D.

Plaintiffs allege that (1) spraying threatens to kill fish because the decomposition of decaying hyacinths depletes the supply of dissolved oxygen in the water necessary to the fish, (2) the spraying causes fish to move to other locations, (3) hyacinths are natural sewage treatment plants which remove effluents from the river and spraying kills them and prevents them from cleaning the water, and (4) the hyacinths decaying on the stream bed contribute to the pollution.

## STANDING

The threshold question which must be resolved by the Court is whether plaintiffs have such a "personal stake in the outcome of the controversy" as to give

No. 72–382–Civ–J–S:

Stephen H. Davis, P. Donald DeHoff, Jacksonville, Fla., for plaintiffs.

them standing to bring the action for a preliminary injunction.[1]

Plaintiffs are residents of the State of Florida who regularly engage in fishing, boating and other forms of recreational activities on the St. Johns River. They allege an interest in enhancing the beauty and natural environment of the area. But plaintiffs allege more than just an injury because of the damage to the river aesthetically or ecologically. They also allege a direct pecuniary loss to their business as commercial fishermen, fish camp operators and to their other water-related income activities.

■■ Economic injury gives a person standing to seek judicial review, but once "review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate". Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Economic injuries will provide standing sufficient to justify judicial review, even in situations where there is no statutory provision granting such review.[2]

In this case, although they have not specifically argued the point, plaintiffs have a statutory basis, as well as their economic injury, on which to found their claim to standing.

Section 10 of the Administrative Procedure Act (APA) provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof".[3]

Plaintiffs have sufficient standing to obtain judicial review of the action of the Corps under Section 10 of the APA because they allege that the challenged action has caused "injury in fact",[4] and that they are personally among the parties injured.[5]

■ Thus, whether the "economic injury test" is applied, or whether the "injury in fact" test is applicable, plaintiffs have standing to bring this action for preliminary injunction.

## PRELIMINARY INJUNCTION

■■ The relief sought by plaintiffs is a preliminary injunction. The grant of a preliminary injunction must be premised upon (1) a strong showing by plaintiffs that they are likely to prevail upon the merits of the case, and (2) a persuasive demonstration that there will be irreparable injury without such interim relief.[6] In issuing a preliminary injunction, the Court is exercising a very far reaching power which should never be indulged except in a case clearly warranting it.[7]

In this case the granting of a preliminary injunction would defeat the very purpose of such injunctions, that is, to maintain the status quo pending the outcome of a hearing on a permanent injunction. For over 20 years the Corps has sprayed the St. Johns River with 2-4D to control hyacinths.

The Corps is authorized by Congress to engage in a continuing program for the control and eradication of water hyacinths and is further charged with the duty of keeping the river navigable and free from all obnoxious aquatic weeds. 33 U.S.C. § 610.

1. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).

3. 5 U.S.C. § 702.

4. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970);

Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

5. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

6. Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'd sub nom. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

7. Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141 (9th Cir. 1964).

■ In deciding whether a preliminary injunction should properly issue, the Court must balance the damage to both parties of granting the injunction or denying it. Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970). The Court must determine whether the plaintiffs have shown irreparable injury to outweigh the hardship defendant alleges will result if spraying is enjoined. Defendant claims that serious, and perhaps irreparable, harm to the public would result from any attempt to enjoin the spraying program: (1) navigation would be seriously impeded by hyacinths completely blocking the river, (2) swimming and boating would be seriously restricted if not eliminated in certain areas, (3) flood control and drainage would be impeded if the discharge capacity of streams and canals was restricted by hyacinths, (4) interference with fish and wildlife would occur as a result of aquatic plants infesting an area, thereby exhausting the dissolved oxygen in the water and rendering shallow water spawning areas unusable, (5) production of disease-carrying and pest mosquitoes would increase in mats of water hyacinths, and (6) water supply for human consumption would be hampered.

Another factor which must be considered in balancing the hardships in this case is the economic burden to the people. It costs the Corps $12.00 per acre to spray the hyacinths. Mechanical harvesting, the only present alternative method of removal, now costs $1,600.00 per acre.[8]

■ The Court finds that plaintiffs' allegations of potential fish kills, and other allegations, are outweighed by the harm to the public that would result from any attempt to preliminarily enjoin the spraying. On the basis of balancing

the harm, this Court denies plaintiffs' motion for a preliminary injunction.

The Court intimates no disposition as to the merits of plaintiffs' claims in a proceeding for permanent injunction, but holds only that the alleged injury claimed by plaintiffs is not sufficient to justify the exceptional remedy of a preliminary injunction.

## NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

Plaintiffs contend that the Corps has not complied with the requirements of the National Environmental Policy Act of 1969 (NEPA) by failing to prepare a statement of the environmental impact of spraying water hyacinths with 2–4D. Such impact statements are required by Section 102 of the Act which became effective January 1, 1970. In that section Congress directs that, "to the fullest extent possible", all agencies of the federal government shall include in every recommendation for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C)(i).

The ultimate issue to be resolved is whether, even though the evidence is not sufficient to justify the issuance of a preliminary injunction, the Court has the jurisdiction and duty to enforce NEPA and require the Corps to prepare and file an environmental impact statement for this continuing project. This Court concludes that it has such jurisdiction and duty.[9]

Defendants concede that no environmental impact statement has been prepared or filed, but contend that, since the spraying of hyacinths with 2–4D is a continuing project which was begun

---

8. Transcript of testimony of Colonel Emmett C. Lee, Jr., District Engineer, United States Army Corps of Engineers, taken at the hearing on June 6, 1972, in Jacksonville, Florida, at page 12. Hereafter cited as "TT".

9. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

over 20 years before enactment of NEPA, no impact statement is required.

In order to resolve the question of whether an impact statement is required in this case, it is necessary to draw a distinction between *continuing* projects begun before enactment of NEPA and *ongoing* projects begun before the enactment of NEPA. An ongoing project is a project which has a definite termination date which is known when the project commences, *e. g.*, construction of a highway. A continuing project, on the other hand, is a project which has no definite termination date but which is intended to continue indefinitely, *e. g.*, spraying the St. Johns River with a herbicide to control water hyacinths.

The reason for distinguishing between continuing and ongoing projects is that an environmental impact statement might be ill-advised for an ongoing project which was near completion when NEPA was enacted,[10] while an impact statement might be advisable and within the scope and intention of NEPA requirements for a continuing project, even though it was begun before NEPA was enacted.

In Ragland v. Mueller [11] the United States Court of Appeals for the Fifth Circuit affirmed this Court's denial of an injunction to prohibit the completion of a highway. Plaintiffs in that case claimed that construction on this ongoing project, which was begun before NEPA was enacted and which was already four-fifths completed, should be halted until an environmental impact statement was prepared. The Court of Appeals held that it would be unreasonable to think Congress had intended for

NEPA to be given such an interpretation after so much of the project was complete.[12]

■ It is clear to this Court that the same principle applies in the instant case and that spraying should not be halted pending the outcome of an environmental impact statement. NEPA neither requires, nor precludes, a moratorium on continuing projects, begun before its enactment, while an environmental impact statement is being prepared.[13] On the basis of Ragland v. Mueller, supra, this Court denies plaintiffs' motion for a preliminary injunction.

The National Environmental Policy Act does not require an environmental impact statement in every case in which a federal agency plans a project, but the instant case is surely one which would have required such an impact statement if it had commenced after January 1, 1970. Colonel Emmett Lee, District Engineer, United States Army Corps of Engineers, in testimony at the hearing, in referring to spraying hyacinths on the St. Johns River, stated that "I think it's obvious there are environmental consequences [involved in this spraying]".[14]

The Corps has recognized the need for impact statements for continuing projects, begun before NEPA's enactment, because they have adopted a policy of attempting to prepare a statement for each of their continuing projects within three years of the effective date of the Act.[15] Although the Corps is vested with broad discretion in selecting the means for complying with its duty to control and eradicate water hyacinths, pursuant to 33 U.S.C. § 610, it is, never-

10. Ragland v. Mueller, 460 F.2d 1196 (5th Cir. 1972).

11. 460 F.2d 1196 (5th Cir. 1972).

12. Some courts have refused to give NEPA retroactive application even where no construction had begun before the effective date of the Act and only the administrative determination of the location of the project was made before the effective date of the Act. Brooks v. Volpe, 319 F.

Supp. 90 (W.D.Wash.1970); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Penn. 1970); *see also* Virginians for Dulles v. Volpe, 344 F.Supp. 573 (E.D.Va.1972).

13. *See* Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1971).

14. TT page 5.

15. TT page 30.

theless, bound to comply with the purpose, intent and requirements of NEPA.

It must be determined whether the policy of NEPA can be achieved by applying its provisions to continuing agency projects, such as the project involved in this case. The sweeping language of the Act indicates a legislative intent favoring application of NEPA to continuing projects.

" . . . [I]t is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources[.] [16]

\* \* \* \* \* \*

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall . . . [comply with the provisions of the Act]." [17]

The intent of Congress to take immediate steps toward implementing a policy of national awareness of the need to consider environmental repercussions of any agency activity pervades the entire Act. The immediacy of the action necessary to implement the Congressional mandate implies an intention to give the Act application to continuing projects. If an impact statement is only required for agency actions conceived and implemented after the effective date of the Act, then a delay is inevitable between the intended effective date of the Act and the time when its benefits are realized. It is clear to this Court that no such delay was intended by Congress, but rather an immediate effort was to be made to comply with the provisions of NEPA.[18] It would be ironic if Congress did not intend to affect those projects and agency decisions that provided the impetus for the Act.[19] Congress doubtless intended that NEPA have some application to the type of situation presented here.

In a recent NEPA case the Court of Appeals for the District of Columbia, in considering a challenge to the construction of a nuclear power plant, stated that "Although the projects in question may have been commenced and initially approved before January 1, 1970, the Act clearly applies to them since they must still pass muster before going into full operation".[20] The Court further stated that there was no doubt that Section 102 of NEPA "creates judicially enforceable duties".[21]

Subchapter II of NEPA establishes the Council on Environmental Quality (CEQ), whose duties and functions include reviewing and appraising federal programs to develop and recommend national policies for the purpose of preserving and improving the quality of the human environment. 42 U.S.C. §§ 4341–4347.

Pursuant to this authorization the CEQ formulated and promulgated guidelines for other governmental agencies. CEQ Guideline 11 is addressed specifically to the requirement of environmental impact statements for government projects initiated prior to the enactment of NEPA on January 1, 1970.

"11. Application of Section 102(2) (C) procedure to existing projects and

---

16. 42 U.S.C. § 4331(b).

17. 42 U.S.C. § 4332.

18. For a legislative statement of the purpose of the Act, *see* House Report No. 91–378, 1969 U.S.Code Cong. & Ad.News 2751.

19. Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich.L.Rev. 732, 745 (1971).

20. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1129 (1971).

21. *Id.* at 1115.

programs. To the maximum extent practicable the Section 102(2)(C) procedure should be applied to further major federal actions having a significant effect upon the environment even though they arise from projects or programs initiated prior to the enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental federal actions be shaped so as to minimize adverse environmental consequences not fully evaluated at the outset of the project or program." [22]

The continued spraying of hyacinths on the St. Johns River with 2–4D is one of those "further major federal actions having a significant effect on the environment" included within the scope of Guideline 11.

■ This Court concludes that it is "practicable", within the meaning of Guideline 11, to direct the Corps to prepare a statement on the environmental impact of the challenged action in this case.

In Zabel v. Tabb,[23] a decision consistent with Guideline 11, the Court of Appeals for the Fifth Circuit held that, although NEPA was not in existence at the time the dredge and fill permit in question was denied, the correctness of the agency's decision was to be determined by the applicable standards of today. Subsequently, in Ragland v. Mueller,[24] the same Court, although refusing to apply NEPA retroactively un-

der the specific circumstances of that case, stated that:

" . . . [T]his court and others have held that in certain situations, the National Environmental Act of 1969 may be applied retroactively, See Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971); Arlington Coalition on Transportation et al. v. Volpe et al., 458 F.2d 1323 decided April 4, 1972, 4th Cir.".

Neither *Ragland* nor any other controlling case discovered by this Court appears to preclude the Court from requiring that a NEPA impact statement be prepared within a prescribed time period, while the project is allowed to continue.[25]

In Bankers Life and Casualty Co. v. Village of North Palm Beach,[26] the Fifth Circuit reaffirmed its holding in Zabel v. Tabb, *supra,* and held that the standard to be applied to determine the ecological impact of a pending project is today's standard based on the considerations provided in NEPA, and is not the standard applicable when the project was first authorized.

This Court cannot say with assurance that the factors considered by the Corps 20 years ago in deciding to spray hyacinths on the St. Johns River with 2–4D have not now changed. It is clear that in order to comply with the mandate of the National Environmental Policy Act the Corps should now prepare a statement on the environmental impact of the challenged spraying.[27]

---

22. 36 Fed.Reg. 7724–7729 (1971). For one court's views on the factors that should be considered in determining the practicability of requiring a NEPA statement after a project has passed the planning stages, see Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal. 1972).

23. 430 F.2d 199 (5th Cir. 1970); *see also* 1 Stetson Intra.L.Rev. 177 (1970).

24. 460 F.2d 1196 (5th Cir. 1972).

25. *Cf.* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir.

1972), where the court held that NEPA would be of no effect if projects can be continued while an impact statement is prepared.

26. 469 F.2d 994 (5th Cir. 1972).

27. This Court will not instruct the Corps of Engineers what should be included in the environmental impact statement or what environmental factors should be considered, because those decisions are within the sound discretion of the administrator in charge of preparing the statement. Neither will the Court decide

While new plans and programs must be structured from the outset in accordance with the requirements of NEPA, the Act also clearly requires that agencies evaluate existing plans in an effort to meet those requirements. Regardless of the number of years a project such as spraying hyacinths has been continuing, it was Congress' unmistakable intent to require federal agencies to objectively evaluate their continuing projects which have an environmental impact.

This Court is unwilling to hold that the lack of an environmental impact statement for this continuing project is ground for enjoining the project's continuance but holds that the Court has jurisdiction, pursuant to the enforcement of the National Environmental Policy Act, to require the preparation of such a statement while the project continues.

This opinion shall constitute the Court's findings of fact and conclusions of law upon plaintiffs' application for a preliminary injunction.

Therefore, it is

Ordered:

1. The United States Corps of Engineers, Department of the Army, and Emmett C. Lee, Jr., District Engineer, United States Corps of Engineers, are hereby directed to prepare, pursuant to 42 U.S.C. § 4331, a statement of the environmental impact of spraying Eichhornia Crassipes (commonly known as water hyacinths) with 2, 4–Dichlorophenoxyacetic Acid (commonly known as 2–4D) on the lakes, tributaries and waterways of the St. Johns River.

2. The United States Corps of Engineers, Department of the Army, and Emmett C. Lee, Jr., District Engineer, United States Corps of Engineers, are hereby directed to file the aforesaid environmental impact statement with this Court on or before December 31, 1972.

3. Plaintiffs' motion for a preliminary injunction in Case No. 72–382–Civ–J–S is hereby denied.

4. Defendants' motion to vacate the temporary injunction in Case No. 72–385–Civ–J–S is hereby granted.

5. The temporary injunction issued by the Circuit Court of the Seventh Judicial Circuit, in and for Putnam County, Florida, on May 26, 1972, is hereby dissolved, vacated and set aside.

6. Plaintiffs' motion for remand, filed June 6, 1972, in Case No. 72–385–Civ–J–S is hereby denied.

the "substantive merits or demerits of a federal undertaking under NEPA". Nevertheless, the Court may eventually be called upon to determine the sufficiency of the agency's compliance with the requirements of Section 102(2)(C). Environmental Defense Fund, Inc. v. Corps of Engineers, 348 F.Supp. 916 (N.D. Miss.1972).