### The FUND FOR ANIMALS, et al., Plaintiffs,

### v.

### Fran MAINELLA, Director National Park Service, et al., Defendants.

### No. CIV.A. 02–11855–PBS.

United States District Court, D. Massachusetts.

Sept. 26, 2003.

Eugenia M. Carris, United States Attorney's Office, Boston, MA, for Fran Mainel-la, Gale Norton, United States Dept. of the Interior.

Kimberly Ockene, Jonathan Lovvorn, Katherine Meyer, Meyer & Glitzenstein, Washington, DC, Paul R. Collier, III, Cambridge, MA, for Barbara Birdsey, Bernard Kaplan, Massachusetts Society For The Prevention of Cruelty To Animals, The Fund For Animals, The Humane Society Of The United States, Loretta Neilsen.

Daniel J. Dwyer, Hanify & King, Professional Corporation, Boston, MA, Daniel J. Lyne, Hanify & King, P.C., Boston, MA, Barbara Miller, Birch, Horon, Bittner and Chcort, P.C., Washington, DC, for Barnstable County League of Sportsmen's Clubs, Inc., Massachusetts Sportsmen's Council, Inc., U.S. Sportsmen Alliance Foundation, Michael J. Veloza.

William P. Horn, Birch, Horton, Bittner and Chcrot, P.C., Washington, DC, for Massachusetts Sportsmen's Council, Inc.

Anna M. Seidman, Vienna, VA, for Safari club Intern., Safari Club Intern. Foundation.

### MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

Plaintiffs[1] challenge hunting on the Cape Cod National Seashore (the "Seashore") on the ground that the National Park Service ("NPS") has failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the implementing regulations, 40 C.F.R. § 1500.1 *et seq.* Plaintiffs also assert that NPS's pheasant hunt program,[2]

---

1. In addition to The Fund For Animals, the plaintiffs are: The Humane Society of the United States, Massachusetts Society for the Prevention of Cruelty to Animals, Barbara Birdsey, Bernard Kaplan, and Loretta Neilsen.

2. On October 17, 2002, this Court denied a motion to temporarily enjoin the pheasant

which releases non-native species into the Seashore ecosystem, violates NEPA as well as NPS's own General Management Policies.

After hearing, the Court **ALLOWS** Plaintiffs' motion for summary judgment on the ground that NPS has failed to comply with NEPA. Accordingly, I order NPS to prepare an environmental assessment of the hunting program. However, I decline to enjoin the hunting program during the pendency of the environmental review. I also enjoin the pheasant hunting program until NPS issues an environmental assessment.

## II. *FACTUAL BACKGROUND*

The following facts are contained in the administrative record ("AR") and are undisputed, except where stated.

The Seashore, a unit of the National Park system, consists of 44,000 acres in outer Cape Cod and includes lands owned by the Commonwealth of Massachusetts, six local towns, and 600 private landowners. Every year, the Seashore hosts 5 million visitors. The Seashore enabling legislation of 1961 provides: "The Secretary may permit hunting and fishing ... within the seashore in such areas and under such regulations as he may prescribe ...." 16 U.S.C. § 459b–6. In 1963, seven years before NEPA became law, the Seashore promulgated special regulations to allow hunting. *See* 36 C.F.R. § 7.67 (1963). The regulations permitted hunting of waterfowl and upland game during the open season prescribed by the Commonwealth in accordance with federal, state, and local laws for the protection of wildlife, "except in developed and/or concentrated public use areas and areas of scientific or historic interest designated by the Superintendent ...." *Id.* The regulations also applied to the carrying of firearms in the Seashore.

Then, in 1966, NPS as a whole implemented regulations allowing hunting within national. recreational areas, including the Seashore, in locations designated for such purposes on a map available for public inspection in the office of the Superintendent. *See* 36 C.F.R. § 2.31 (1966). Although the hunting regulations were amended from time-to-time, they remained substantially the same until 1981. Under a Memorandum of Understanding dated December 30, 1968, the Seashore worked cooperatively with the Commonwealth of Massachusetts on wildlife management within the Seashore. Both the Commonwealth and NPS share jurisdiction over hunting. (AR–I–E–1.)

In September 1981 NPS engaged in a NEPA process for proposed changes to its general hunting regulations. In that process, it produced an Environmental Assessment ("EA") and issued a Finding of No Significant Impact ("FONSI"), stating:

> If [a park's enabling legislation] permits hunting, on a discretionary basis, special regulations for that park will be required in order to implement a hunting program. This will ensure that there is an opportunity for public comment in the process of decision making in such cases. Parks whose legislation requires that hunting or trapping or both be permitted will do so under appropriate restrictions to protect the integrity of park resources and the safety of visitors.

(AR–I–A–42.)

Special regulations pertaining to hunting at the Seashore, published on April 30, 1984, provide:

hunt program, *Fund for Animals v. Mainella,* 02–11855–CIV–PBS (D.Mass. Oct. 17, 2002) at 5, on the ground that Plaintiffs, who sued at the last minute, had not demonstrated irreparable harm. On November 18, 2002, Plaintiffs amended their complaint to include not just the pheasant program but the general hunting program as well.

(i) Hunting. (1) Hunting is allowed at times and locations designated as open for hunting.

(2) Only deer, upland game, and migratory waterfowl may be hunted

(3) Hunting is prohibited from March 1 through August 31 of each year.

36 C.F.R. § 7.67 (1984) (AR–I–A–141.)

The *Federal Register* of April 30, 1984, which re-codified the Seashore hunting regulations, states: "As required by [NEPA], the Service has prepared environmental assessments on those portions of this rulemaking which are other than correcting or clarifying in nature and has made a [FONSI]." (AR–I–A–140.) However, there is no EA for Seashore hunting in the administrative record, and no evidence concerning its content. NPS suggests, without record support, that it might have been destroyed pursuant to NPS's normal record disposition schedule. *See* 44 U.S.C. § 3102(2) (requiring agencies to create management plan to "facilitate . . . disposal of records of temporary value"). Plaintiffs argue that it is unlikely an EA on hunting was prepared at all as the 1983–1984 special regulation on hunting was simply a recodification of the previously-existing regulation. The mystery as to whether an EA was ever prepared on hunting remains unresolved. In any event, the hunting regulations for the Seashore have not significantly changed since 1984.

In 1998 NPS produced an EIS for a General Management Plan for the entire Seashore. In explaining the need for a General Management Plan, the Seashore discussed the changes evident since the release of the 1970 Master Plan. The area's population had nearly doubled in size, the 1998 EIS pointed out, "creating pressure on open space and regional infrastructure (e.g., ground water and transportation)." (AR–III–B–EIS–3.) The previ-

ous two decades, the 1998 EIS further stated, had seen a considerable increase in year-round residents. While national seashore visitation basically reached a plateau, "the pattern of visitor use has shifted slightly, with somewhat fewer visitors during the peak summer season and more during the spring and fall shoulder seasons." (*Id.*) It also pointed out: "Plant, marine, and wildlife communities have been disrupted by the introduction of non-native species, *increased hunting* and fishing, and ditching and spraying to control mosquitoes." (*Id.* at 6.) (Emphasis added.)

Just as the 1998 EIS explicitly stated the reasons for its creation, it also specifically adumbrated the limitations of its intended scope. The document stated:

> This *Final Environmental Impact Statement* is a programmatic statement. The proposed action and alternatives each consist of a basic management framework for future decision making; site-specific details and recommendations are generally not included. Consequently, the statement presents an overview of potential impacts relating to the proposed program for each alternative. In the future, *implementation of specific actions included in the approved final general management plan would require the preparation of more detailed environmental assessments*. These documents would be tiered to this programmatic impact statement.

(AR–III–EIS–iii.) (Emphasis added.)

The Seashore considered three alternatives in the 1998 GMP/EIS. Alternative 1 was a continuation of the "current management" plan, often referred to as the "no action" or "minimum requirements" alternative. Alternative 2 was a proposed action that would seek to maintain a balance between resource protection and public use. Alternative 3 would build on Alternative 2's initiatives and focus on NPS's tak-

ing a more active role in directing efforts to preserve natural and cultural resources within the national seashore. (AR–III–EIS–35.) Alternative 2 was chosen.

The 1998 GMP/EIS's proposed (and ultimately selected) action with respect to Seashore hunting is described as follows:

> A consistent policy toward stocking programs for hunting and fishing would be developed in cooperation with the Massachusetts Division of Fish and Wildlife. The use of native species would be encouraged in such programs.
>
> Hunting and fishing within the national seashore (focusing on native species) would be allowed at levels compatible with the purposes of the seashore and with sustainable populations and ecosystems. Efforts would be made to minimize conflicts with other visitor uses and private property. Public safety would continue to be addressed by use area designations, patrols, and other monitoring techniques. Habitat would not be altered merely to support game animals. Shellfishing activities would not be altered by the proposed plan; they would continue to be managed by the state and local communities.

(*Id.* at 74.) In its "impacts" section, the 1998 EIS describes hunting impacts for the selected alternative:

> The National Park Service would work with the Massachusetts Division of Fish and Wildlife to evaluate wildlife management activities at the seashore, especially those involving stocking and reintroductions of both native and nonnative species. The NPS goal of restoring natural, self-sustaining ecosystems could lead to limiting or eliminating the use of exotic species. As described under alternative 1, studies would be undertaken to determine the impacts of exotics, especially pheasants, on native species.

The impacts of other hunting and fishing programs on animals and their habitat would be similar to those described in alternative 1. In addition, an increased effort would be made to monitor and manage hunted species.

(*Id.* at 236.)

The description of the impact of alternative one (the status quo) states:

> Wildlife management actions are based primarily on state policy rather than NPS policy and include 'put and take' programs using exotic species. Very little is known about the impacts of stocking exotic species to create hunting opportunities.
>
> Biologists consider the white-tailed deer population on the Outer Cape to be at an appropriate level (NPS 1994a). Deer hunting is generally viewed as an effective way to control population levels. Overpopulation of deer in other areas in the East where deer hunting is prohibited has caused significant impacts on vegetation. There is little scientific data about the impacts of hunting on other species (such as grouse, quail, rabbit, raccoon, crow, coyote, fox, and squirrel).

(*Id.* at 207.)

NPS currently allows hunting of over a dozen native species of waterfowl and upland game, including ducks, grouse, sparrows, woodchucks, crows, rabbits, raccoons, opossums, foxes, weasels, squirrels, coyotes and deer. NPS authorizes hunting from September through February 28 at "the times and location" the Seashore superintendent designates "as open for hunting." (AR–I–B–61.) NPS permits hunting as close as 150 feet from pedestrian and bicycling trails, and as close as 500 feet from private homes. Hunters may bring with them as many as six unleashed dogs per group. (*Id.*)

### A. *The Pheasant Release and Hunt*

Pheasants are not native to Cape Cod. Since the 1960's, and perhaps as far back as the 1940's, farm-raised pheasants have been stocked in three areas of the Seashore each October, specifically for the purpose of the pheasant hunt. These three areas (Hatches Harbor in Provincetown, Boundbrook in Wellfleet, and the Marconi Wildlife Management area in Wellfleet) cover 2,750 acres, about seven percent (7%) of the total acreage. Pheasant hunting takes place on six Saturdays in the fall.

In 1996, the Seashore decided to conduct a two-year study of the environmental impact of the pheasant hunt program. Before the study was begun, the Seashore produced an EA and a FONSI on the "interim pheasant management program," dated August 1996, stating that the study itself would have no significant impact on the environment. The EA stated that the purpose of the study was to "advise critically and objectively and provide data to NPS managers for an appropriate management decision." (AR–II–A–6.) The EA stated: "the hunting and stocking program would be allowed to continue on an interim basis while a comprehensive study is undertaken on hunting activities, pheasant survival, and potential impacts to native flora and fauna." *Id.*

The report that resulted from this study, *Survival and Ecological Impacts of Released Ring–Necked Pheasants on Cape Cod National Seashore,* authored primarily by University of Massachusetts researcher C. Adam Bump, concluded in January 1999 that the released pheasants were not in the field long enough to have a negative impact on the seashore ecosystem and that "released pheasants on Cape Cod do not survive into the spring in numbers substantial enough to maintain a breeding population." (AR–II–B–148.) However,

the report also recommended methods for further study "to more accurately assess the energetic contribution of released pheasants" to native predator species in the Seashore. (*Id.* at 168.)

The 1998 EIS for the General Management Plan also addressed the pheasant stocking program. The proposed alternative in the plan states: "A consistent policy toward stocking programs for hunting and fishing would be developed in cooperation with the Massachusetts Division of Fish and Wildlife. The use of native species would be encouraged in such programs." (AR–III–EIS–74.) In the impacts section of the 1998 EIS, the document adds that "studies would be undertaken to determine the impacts of exotics, especially pheasants, on native species." (*Id.* at 236.)

On October 7, 2002, on the eve of this Court's hearing on Plaintiffs' motion for a temporary restraining order, the Deputy Assistant Secretary for Fish and Wildlife and Parks granted a request for a "waiver of Management Policies to the extent necessary to allow the pheasant stocking/hunting program to continue uninterrupted while we [NPS] continue to examine options for phasing it out." The Management Policies state: "Adherence to policy is mandatory unless specifically waived or modified by the Secretary, the Assistant Secretary, or the Director."

## III. DISCUSSION

### A. *The Statutory and Regulatory Framework*

▆▆▆ NEPA has two basic goals. First, it requires government agencies "to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc.,* 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Second, it ensures

that an agency will "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA, however, does not impose any substantive requirements on federal agencies; its dictates are procedural only. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

NEPA provides that agencies should, *inter alia*, "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings" and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b). NEPA requires all federal agencies to consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). NEPA's implementing regulations define "major Federal action[s]" to "include new *and continuing activities.*" 40 C.F.R. § 1508.18(a) (emphasis added). A NPS Handbook on NEPA states:

> CEQ [the Council on Environmental Quality, responsible for promulgating NEPA's implementing regulations] defines federal actions subject to NEPA evaluation to include 'continuing activities' (1508.18) in addition to new projects or programs. If your park is making an explicit or a tacit decision to continue with an activity that may have significant impacts to the environment, and either NEPA has never been done or an outdated or inadequate document was used in deciding to take the original action, you should initiate the NEPA process and prepare a document for public review.

(AR–VI–A–163.) Before commencing such actions, agencies must produce a "detailed statement," known as an Environmental Impact Statement ("EIS"), addressing the environmental impact of the action and possible alternatives to the action. *Id.*

If an agency is uncertain as to whether its proposed action constitutes a "major Federal action[ ] affecting the quality of the human environment," it must prepare a preliminary Environmental Assessment to determine whether an EIS is needed. *See* 40 C.F.R. § 1501.4. The EA is a "concise public document" that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). If an agency chooses to produce an EA before, or in lieu of, a full EIS, the EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of the NEPA statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) The agency must involve the public "to the extent practicable" in preparing the environmental assessment. 40 C.F.R. § 1501.4(b).

To determine whether an action has a significant impact, the agency must apply ten "intensity" factors. 40 C.F.R. § 1508.27. One factor is the degree to which the "proposed action" affects public health or safety. § 1508.27(a)(2). Others are "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," § 1508.27(a)(4), and "unique characteristics of the geographic area." § 1508.27(b)(3).

█ If after preparing an EA the agency determines that no EIS is needed, the agency must issue a Finding of No Significant Impact explaining why its proposed

action will have no significant impact on the environment. 40 C.F.R. § 1501.4(e). *See* 40 C.F.R. §§ 1508.9, 1508.13. The FONSI must be made available to the affected public. § 1504.3(b). "An EA aims simply to identify (and assess the 'significance' of) potential impacts on the environment ...." *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir.1985) (distinguishing between an EA and an EIS).[3]

■ In certain circumstances, the agency is obligated to produce a supplemental environmental report: "Agencies shall prepare supplements to either draft or final environmental statements if (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *See* 40 C.F.R. § 1502.9(c). "If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting 42 U.S.C. § 4332(2)(C)). Although CEQ regulations do not explicitly require agencies to supplement EA's, some courts have held that NEPA requires an agency to supplement an out-of-date EA. *See Price Road Neighborhood Ass'n v. U.S. DOT*, 113 F.3d 1505, 1509 (9th Cir. 1997) (holding that the standard for sup-

plementing an EA is the same as for an EIS); *Coalition for a Livable Westside v. U.S. Postal Service*, 2000 WL 1264256 *3–4 (S.D.N.Y.2000).

■ NEPA requires that an agency take a "hard look" at the environmental consequences of a proposed action before pursuing it. *Baltimore Gas and Electric Co.*, 462 U.S. at 97, 103 S.Ct. 2246. The statute dictates that an EIS must contain a "*detailed* statement" of the environmental impacts of and reasonable alternatives to the proposed action. 42 U.S.C. § 4332(C) (emphasis added). The First Circuit has repeatedly underlined the word *detailed* in interpreting this statutory provision, noting that it " 'connotes the careful, reasoned and fully explained analysis which we think Congress intended.' " *Dubois v. United States Dep't of Agriculture, et. al.*, 102 F.3d 1273, 1285 (1st Cir.1996) (quoting *Silva v. Lynn*, 482 F.2d 1282, 1284 n. 2 (1st Cir.1973)). NEPA's implementing regulations also flesh out what is to be included in a statutorily-required environmental impact statement. *See generally* 40 C.F.R. §§ 1502.1–1502.25. For example, the regulations state that an EIS *shall* include discussions of:

(a) Direct effects and their significance.

(b) Indirect effects and their significance.

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local ... land use plans, policies and controls for the area concerned.

---

**3.** Agencies may also invoke a "categorical exclusion" for "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [NEPA's] regulations and for which, therefore, neither an environmen-

tal assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4. Defendants make passing assertions in their briefs that hunting may be categorically excluded from NEPA procedures, but do not press the point. The Court deems the argument waived.

(d) The environmental effects of alternatives including the proposed action
. . . .

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures. . . .

(h) Means to mitigate adverse environmental impacts.

40 C.F.R. § 1502.16 (emphasis added; internal cross-references omitted). The regulations further require that:

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.

40 C.F.R. § 1502.24.

■ The courts have "applied 'a rule of reason in determining whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Dubois,* 102 F.3d at 1287 (summarizing statutory and regulatory requirements of an EIS) (citations omitted). "One aspect of this determination is whether the agency has gone 'beyond mere assertions and indicate[d] its basis for them.' The agency 'must explicate fully its course of inquiry, its analysis and its reasoning.'" *Id.* (citations omitted).

B. *Judicial Review*

■ Plaintiffs have the burden of proof in challenging the agency's action under NEPA. *See Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir.1995). Judicial review of a federal agency's compliance

with NEPA is governed by section 10 of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A). *See Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 202 (1st Cir.1999). Thus, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting APA, 5 U.S.C. § 706), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "While this is a highly deferential standard of review, it is not a rubber stamp. The reviewing court must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." *Airport Impact Relief,* 192 F.3d at 203 (citations omitted). An agency's decision to issue an EA and a FONSI in lieu of an EIS is evaluated under the "arbitrary and capricious" standard. *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851 ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to the 'informed discretion of the responsible federal agencies.'") (citations omitted).

■ An agency's failure to initiate any NEPA process, that is, its failure to prepare even an EA and a FONSI for an action, should be reviewed under a less-deferential reasonableness standard. *See Northcoast Environmental Center v. Glickman,* 136 F.3d 660, 667 (9th Cir.1998) (applying reasonableness standard to "threshold agency decision[ ]" as to whether tree fungus management program required NEPA process); *Sugarloaf Citizens Ass'n v. Federal Energy Regulatory Comm'n,* 959 F.2d 508, 512 (4th Cir.1992) ("[W]hen an agency makes the threshold determination that its actions do not con-

stitute a 'major Federal action,' the question concerning the applicability of NEPA is reviewed for reasonableness under the circumstances.") (emphasis removed) (citations omitted); *Goos v. I.C.C.*, 911 F.2d 1283, 1292 (8th Cir.1990) (applying reasonableness standard to "threshold issue of NEPA applicability in the first instance."). The difference between the "arbitrary and capricious" standard and the "reasonableness" standard is "not of great pragmatic consequence." *Marsh*, 490 U.S. at 377 n. 23, 109 S.Ct. 1851.

### C. *The Status* Quo

■ Defendant-intervenors (but not NPS) argue that NEPA is not applicable to the Seashore's hunting program because it was in place before NEPA became law. However, an ongoing federal program that was initiated prior to NEPA is not exempt from NEPA obligations. *See Jones v. Lynn*, 477 F.2d 885, 889 (1st Cir.1973) (holding " 'the only correct interpretation [of NEPA] would seem to be that if the requirements of the Act can feasibly be applied—even if the project in question was begun prior to the enactment of NEPA—then they should in fact be applied.' ") (citation omitted); *Boston Waterfront Residents Ass'n v. Romney*, 343 F.Supp. 89, 91 (D.Mass.1972) (applying NEPA to HUD financed building project begun before NEPA but continuing after it).

■ An agency is required to examine the environmental consequences of ongoing federal programs that began before NEPA, but never received NEPA review. In *Lee v. Resor*, 348 F.Supp. 389, 394 (M.D.Fla.1972), for example, plaintiff challenged an annual herbicide spraying program that had begun twenty years before NEPA was passed. It was a "continuing project ... which has no definite termination date but which is intended to continue indefinitely." *Id.* Reasoning that the herbicide program was "surely one which would have required [ ] an impact statement if it had been commenced after January 1, 1970," the court held that "the sweeping language of the Act [NEPA] indicates a legislative intent favoring application of NEPA to continuing projects." *Id.* at 395. Although the court ordered the defendant to perform a NEPA analysis of the program, it did not halt the herbicide spraying in the meantime, noting that neither NEPA nor caselaw "appears to preclude the Court from requiring that a NEPA impact statement be prepared within a prescribed time period, while the project is allowed to continue." *Id.* at 396. *See also National Organization for the Reform of Marijuana Laws v. United States Dep't of State*, 452 F.Supp. 1226, 1234 (D.D.C.1978) (declining to enjoin federal agency's herbicide spraying of marijuana crops but requiring agency "forthwith to complete the required environmental impact statement and circulate it for comment and consideration.").

Defendant-intervenors also argue that no EA is needed for a federal action that does not change the status quo. *See Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990) (concluding that no EIS was required on the operations of a completed dam where defendants were "simply operating the facility in the manner intended .... doing nothing new, nor more extensive, nor other than contemplated when the project was first operational."); *City and County of San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir.1980) (rejecting NEPA challenge to Navy's lease of shipyard: "the Navy was not required to evaluate the environmental consequences of the lease as if the Navy were proposing to establish this multimillion

dollar industrial complex for this first time.").

■ However, an agency must determine if conditions have so changed, either with respect to the action or with respect to the environment in question, that a new EA is required. *See generally Oregon Natural Resources Council,* 490 U.S. at 372, 109 S.Ct. 1851 (federal agencies have a duty to take a "hard look" at their proposed actions even after they have received initial approval and must supplement NEPA processes where there " 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts' ") (citations omitted). *See also Fund for Animals v. Thomas,* 127 F.3d 80, 83–4 (D.C.Cir.1997) (holding that no EIS would be required for federal agency's decision to turn game-baiting policy over to states where agency produced EA and FONSI concluding that "the environmental consequences" of the action "would be negligible" since it would not significantly alter the status quo); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1003 (D.C.Cir.1979) (holding that no EIS need be prepared for its decision to lease a parking facility to private company where EA indicated that lease would not alter environmental status quo). When an agency decides that conditions have not changed sufficiently to trigger NEPA, however, it must state its reasons in an EA.

■ Defendants repeatedly point out that Plaintiffs did not submit any comments on the 1998 GMP/EIS, and have not challenged the general hunting program before filing this lawsuit. Plaintiffs explain that the notice in the Federal Register for the 1998 EIS did not point out that the NEPA process involved the hunting program. However, even if Plaintiffs were asleep at the switch, the failure to submit comments does not bar this action under the doctrine of laches so long as the challenge is timely. *Cf. Jones,* 477 F.2d at 892 (noting that laches is disfavored in environmental cases: "most fundamental ... is the observation of Chief Judge Friendly that the 'tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency.' ") (quoting *City of New York v. United States,* 337 F.Supp. 150, 160 (E.D.N.Y.1972)).

### D. *Federal Involvement*

■ Defendant-intervenors (but not the NPS) also argue that the state is primarily responsible for the hunting programs, and that there is therefore insufficient federal participation for the programs to constitute a "major *Federal* action." 40 C.F.R. § 1508.18(a) defines "major Federal actions" to include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies ...." *Cf. Mayaguezanos por la Salud y el Ambiente v. United States,* 198 F.3d 297, 302 (1st Cir.1999) (holding that in determining whether a challenged private action may be deemed federal for purposes of NEPA, "we look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome"). "[F]ederal 'approval' of another party's action does not make that action federal unless the federal government undertakes some 'overt act' in furtherance of that other party's project." *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1244 (D.C.Cir. 1980) (declining to impose NEPA process on federal decision not to intervene in Alaska's wolf hunt program where federal agency did "nothing more than fail to

prevent the other party's action from occurring."); *Fund for Animals v. Thomas,* 932 F.Supp. 368, 371 (D.D.C.1996) (holding that Forest Service policy of deferring to states on game-baiting was not a major federal action).

■ The administrative record reveals that NPS makes a "substantial contribution of personnel and equipment" (AR–V–B–2–99) to the management of the Seashore's hunting program. The superintendent determines the areas where hunting occurs and the Commonwealth determines the open season. In the words of the GMP, NPS shares management of the Seashore with the Commonwealth. *Fund for Animals v. Clark,* 27 F.Supp.2d at 12–13 (holding that state plan to hunt bison on federal land was a federal action because the federal agency had a hand in developing the hunt). Accordingly, there is sufficient federal participation to make Seashore hunting a "major Federal action."

### E. The Adequacy of Previous Seashore NEPA Processes

All defendants contend that even if NEPA does apply to the Seashore hunting program, it has been satisfied by both the 1983 EA and the 1998 EIS/GMP.

Although the 1983 EA is not in the administrative record and has apparently been lost or destroyed, the Court will presume it once existed because it is referenced in the Federal Register. *See* 44 U.S.C. § 1507(1) ("The publication in the Federal Register of a document creates a rebuttable presumption ... that it was duly issued, prescribed, or promulgated."). However, it is not clear what issues the EA addressed. As the government points out, the statute of limitations for challenging the sufficiency of the 1983 EA has run. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is

filed within six years after the right of action first accrues."); *see also Southwest Williamson County Community Ass'n, Inc. v. Slater,* 173 F.3d 1033, 1036 (6th Cir.1999) (applying six-year statute of limitations in NEPA case and holding that claim accrued at the time of the "final agency action" of issuing an EA and FONSI in connection with challenged project); *Zarrilli v. Weld,* 875 F.Supp. 68, 72–3 (D.Mass.1995) (applying six-year limitations period in NEPA case).

However, NPS recognizes that it has a duty to conduct an environmental assessment and/or review to examine changed circumstances. The 1998 EIS points out that there have been significantly changed circumstances over the last two decades resulting from the dramatic increase in population on the Cape, the impact of development, the increase in hunting, and the slight shift in visiting times from the peak summer months to the fall and spring periods. A 1999 resource management plan states: "Safety concerns are becoming more pressing as hunters are displaced from rapidly developing adjacent lands and the number of deer drives increases." (AR–V (b–2) 097). *See also* AR–V (b–1) 327 (1992) (expressing same concerns). NPS contends that the 1998 EIS/GMP took the "hard look" at these changed circumstances that is required by law.

■ The key issue, then, is whether the 1998 EIS/GMP is an adequate environmental impact statement for the Seashore hunting program. The 1998 EIS/GMP was intended as a general "overview" (its word) for the entire Seashore. It did not, and was not intended to, take a hard, site-specific, detailed look at hunting. It did not examine the direct and indirect effects of hunting, for example, by examining the effect of hunting on the population of the various different species hunted in the Seashore, the impact of the presence of

hunters in different areas within the Seashore, or public safety concerns associated with hunting weapons being used in the Seashore, which is also utilized by a great number of non-hunters. *See* 40 C.F.R. § 1502.16. Nothing in the 1998 EIS/GMP indicates with any precision what "course of inquiry," *Dubois,* 102 F.3d at 1287, the agency took with respect to examining hunting in the Seashore. The absence of any probing discussion of these or like issues is not surprising in light of the fact that the 1998 EIS/GMP was not intended as a NEPA process for site-specific Seashore hunting.

Defendants make passing reference to "Resource Management Plans," which include discussions of environmental issues. However, a review of these plans reinforces plaintiffs' claim that little is known about the impact of hunting on the Seashore. Indeed, one Resource Management Plan from 1999 states that "essentially nothing is known about the impacts of hunting on the park ecosystems." (AR–V–(B–2)–99). The Resource Management Plan and Environmental Assessment[4] for Cape Cod National Seashore, dated March 3, 1982, similarly states: "Research is necessary to determine the effect of hunting on the population levels of various game species and the possible changes that might be occurring to the natural ecosystems and wildlife as a result of hunting. This research would determine the need for greater protection of game species within the Seashore area." (AR–V–(B–1)–4). The Resource Management Plan from 1985 states: "The role of hunting, release of game birds and impact on other game and non-game species need to be evaluated together with an examination of possible

ecological changes due to stocking and hunting." (AR–V–(B–1) 188). The ineluctable conclusion is that research and evaluation of the environmental effects of hunting have been put on the back-burner for two decades. Defendants do not press any argument that recent Resource Management Plans themselves satisfy NEPA, and the Court finds that they do not.

Both new and longstanding hunting programs have been subject to NEPA processes in other parts of the country, often resulting in EA's and FONSI's. *See Anderson v. Evans,* 314 F.3d 1006, 1017–18 (9th Cir.2002) (upholding agency's EA and FONSI produced for renewal of whale hunting program for the first time in decades because, *inter alia,* EA showed there was little threat to the viability of the whale population and no public safety concerns); *Humane Society of the United States v. Hodel,* 840 F.2d 45, 61–63 (D.C.Cir.1988) (sustaining issuance of EA and FONSI produced in connection with agency's decision to allow bird hunting in refuge); *Fund for Animals v. Frizzell,* 530 F.2d 982, 985–86 (C.A.D.C.1976) (sustaining denial of preliminary injunction brought in connection with the issuance of EA and FONSI produced for a pre-existing hunting program); *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 47–8 (D.D.C.2003) (sustaining issuance of EA and FONSI produced in connection with swan hunting); *Humane Society of the United States v. Watt,* 551 F.Supp. 1310, 1322 (D.D.C.1982) (sustaining latest in a series of NEPA processes produced for black duck hunting, which pre-dated NEPA by decades); *National Rifle Association of America, Inc. v. Kleppe,* 425 F.Supp. 1101, 1111 (D.D.C.1976) (sustain-

---

4. According to NPS, some early Resource Management Plans from the 1980's were also called environmental assessments, but this nomenclature changed in ensuing years. De-

fendants do not cite to anything in the voluminous record that indicates any public involvement in the Resource Management Plans.

ing agency EIS requiring "steel shot" to be used for bird hunting instead of "lead shot").

In the words of the General Management Plan, "preparation of more detailed environmental assessments" is needed before the Seashore's NEPA obligations are satisfied with respect to hunting. It is unclear whether an EA on hunting was ever prepared, but if it was, it is outdated. Accordingly, the Court orders the Park Service to conduct an appropriate site-specific environmental assessment of the hunting program to determine whether it has a significant environmental impact requiring the preparation of an Environmental Impact Statement.

■ However, the Court declines the invitation to enjoin the hunting program. Because the environmental consequences of the hunting program have not been comprehensively evaluated, it cannot be known whether or not *ending* hunting will have a deleterious environmental effect, such as by allowing for the over-breeding of some species, like deer. The most equitable and prudent solution is to allow the status quo to continue during the pendency of the environmental review.

### F. *Pheasant Hunting*

■ Plaintiffs argue that NPS never issued an EA, a FONSI, or an EIS with respect to the pheasant program. After a review of the administrative record, the Court concludes that the 1996 EA and FONSI applied only to the impact of the Bump study itself, not to the pheasant hunting program as a whole. This can easily be seen not only in the language of the EA and FONSI, but in the fact that the documents were released *before* the Bump study on the impact of pheasants was even begun.

Defendants press the point that this is a mere technical deficiency in compliance because (1) the Bump study found that the pheasant release program has no adverse effects on native populations; (2) the Advisory Commission reviewed the pheasant stocking issue at three meetings in 2002 (February 1, April 26, and September 27), conducted a public meeting in March 2002, and issued a report on September 27, 2002 declining to recommend discontinuation; (3) the waiver of the management policies was well-reasoned and tantamount to a FONSI; and (4) the 1998 GMP/EIS discusses three alternatives for the program.

While it is true that NPS has considered the environmental consequences of the pheasant program, it has never issued a public EA or a FONSI as it is required to do under the NEPA regulations. Nor has it involved the public by permitting comments on a draft EA. The passing references to the pheasant hunting program in the 1998 GMP/EIS do not suffice even as an EA. The First Circuit has made clear that documentation in the administrative record suggesting that an agency has seriously reviewed the environmental issues surrounding its action does *not* satisfy NEPA's demands. *See Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1073 (1st Cir.1980) ("[T]he requirement of a detailed statement is not a pointless technicality even when the agency has in fact considered environmental factors in good faith; intra-agency consideration lacks the benefits secured by discussion in the EIS."); *Commonwealth of Mass. v. Watt,* 716 F.2d 946, 951 (1st Cir.1983) ("[U]nless a document has been publicly circulated and available for public comment, it does not satisfy NEPA's EIS requirements.").

NPS has had a year since the initiation of the suit to comply with NEPA and issue

an EA.[5] The Court enjoins the pheasant hunt program until it does so.

### ORDER

Plaintiffs' motion for summary judgment is **ALLOWED,** and Defendants' motions for summary judgment are **DENIED.** The Court **ORDERS** defendant National Park Service to prepare an environmental assessment for its general hunting program. It shall submit a proposed schedule for the preparation of a site-specific environmental assessment in sixty (60) days. The Court enjoins the pheasant hunting program until an environmental assessment is prepared.

5. Because the Court finds that NPS has not complied with NEPA, it does not address the alternative arguments on the validity of the waiver of general management policies.