The **FUND FOR ANIMALS,**
et al., Plaintiffs,

v.

**Jamie Rappaport CLARK, Director,**
**U.S. Fish and Wildlife Service,**
et al., Defendants.

**Civil No. 98CV2355 (RMU).**

United States District Court,
District of Columbia.

Oct. 30, 1998.

Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Paul Anthony Lenzini, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, Gay Woodhouse, Office of Attorney General, Cheyenne, WY, for Defendants.

## MEMORANDUM OPINION

URBINA, District Judge.

### I. Introduction

This matter is before the court upon plaintiffs' motion for a preliminary injunction, defendants' and intervener's respective oppositions thereto, and plaintiffs' reply.[1] Plaintiffs are the Fund For Animals, a group concerned with wildlife issues, and three individuals. Defendants are the federal agencies charged with administering the federal lands at issue in this case. Plaintiffs seek to have the court enjoin the defendants from conducting an organized hunt to thin the population of American bison living on federal lands in the state of Wyoming. After a review of

---

1. The court grants the unopposed request of the state of Wyoming to intervene in this matter. Accordingly, intervener's opposition to plaintiffs' motion for a preliminary injunction is hereby ordered accepted as filed and has been duly considered by the court in arriving at its decision.

the parties' pleadings, as well as the relevant law and the entire record herein, the court concludes that plaintiffs are entitled to the injunctive relief they seek.

## II. Background

This matter concerns the proposed plan of the federal government to reduce the size of a herd of American bison (bison) located on federal lands in northwestern Wyoming. Specifically, the United States Fish and Wildlife Service (FWS), United States Park Service (USPS), and the National Forest Service (NFS) propose that a controlled hunt be held within specific federal parklands and reserve areas to reduce the herd size. The real issue, however, is not how the herd size is to be reduced or even if it should be reduced at all. Rather, the question before this court is whether the federal defendants have followed the proper procedures in permitting an organized hunt to reduce the number of bison in northwestern Wyoming. In order to answer this question, the court shall give a brief background description of the geographic area involved as well as the applicable wildlife in that area.

The area which the bison have made home is in the northwestern part of Wyoming. The area in question is encompassed by the Grand Teton National Park (GTNP), the Bridger–Teton National Forest (BTNF) and the National Elk Refuge (NER). Around the turn of the century, the federal government created the NER in northwestern Wyoming as a winter reserve for elk. In 1929, the federal government created the GTNP as part of the National Parks System directly adjacent to the NER. The NER is managed by the FWS and the GTNP is managed by the USPS. Beginning in approximately 1912, the federal government implemented a winter feeding program on the NER for elk to provide an adequate winter food supply. Each winter, the federal government decides, based on several factors, the extent of that year's winter feeding program. Importantly, only a handful of times since the origination of this program have the conditions been such that the federal government decided not to offer the elk any supplemental feed during the winter.

The bison were exterminated from northwestern Wyoming in approximately 1840 through over hunting. Bison were reintroduced into the area in 1948 with a small herd of twenty bison. This herd eventually settled on land that, in 1950, became part of the GTNP. During the 1960's the USPS and the Wyoming Game and Fish Department (WGFD) managed this small herd of bison through various methods. In 1968, a portion of the herd escaped its fenced area and thereafter roamed free within the confines of the GTNP. During the winter of 1975–76 however, the bison migrated further south into the NER. Since that time, the herd has spent a large majority of its winters on the NER. Sometime after it began migrating in the winter to the NER, the herd discovered the supplemental feed meant for the elk and began foraging on this feed. Unfortunately, the increased consumption of this feed by the bison displaced the elk, for whom the feed was originally intended. In an effort to eliminate this problem, the NER staff began in 1984 to put out separate feed lines for bison and elk. Due in large part to the availability of this supplemental winter feed, the bison herd has grown rapidly to where it now numbers approximately 435 animals. The federal defendants, in conjunction with the WGFD, have concluded that a herd of this size poses several hazards and thus have decided to reduce the number of animals in the herd through an organized hunt. In response to this decision, plaintiffs filed the instant action seeking emergency injunctive relief.

## III. Discussion

### A. Standard of Review

■ In order for plaintiffs to prevail in their request for a preliminary injunction they must shoulder the burden of meeting the four part test enunciated in *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842–44 (D.C.Cir. 1977). This four part test requires plaintiffs to demonstrate that (1) they are likely to succeed on the merits, (2) they will suffer irreparable harm if the injunction is not granted, (3) other interested parties will not suffer substantial harm if the injunction is granted, and (4) injunctive relief is in the

public interest. *See id.* After examining the entire record in this case, the court concludes that plaintiffs have carried their burden. The court will now address each of the *Holiday Tours* factors in turn.

## B. Analysis

### 1. Likelihood of Success on the Merits

In conjunction with deciding plaintiffs' likelihood of success on the merits, the court must measure defendants actions against the arbitrary and capricious standard found in the Administrative Procedure Act, 5 U.S.C. Section 706(2)(A). Under this standard, the court will overturn any agency decision if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2). An agency action is arbitrary and capricious if the agency has failed to follow procedure as required by law, *see* 5 U.S.C. § 706(2), or has entirely failed to consider an important aspect of the problem. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In instances where a statute requires an agency to consider particular factors, "the only role of the court is to insure that the agency has considered the [factor]." *Getty v. Federal Savings and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986) (internal quotations omitted).

Plaintiffs offer two arguments to support their request for injunctive relief. First, plaintiffs claim that the federal defendants have violated the National Wildlife Refuge System Administration Act of 1966 (NWRSAA), 16 U.S.C. § 668dd *et seq.*, as amended by the National Wildlife Refuge System Improvement Act of 1977 (NWRSIA) (both hereinafter collectively referred to as the "statute") by not conducting a compatibility study to determine if the supplemental feeding programs for elk and bison are "uses" that are compatible with the purpose of the NER. Second, plaintiffs allege that the federal defendants have violated the National Environmental Policy Act (NEPA) and its implementing regulations by not performing the required studies to determine the combined environmental impact of the elk and bison feeding programs and the bison management plan on the ecosystems of the GTNP, NER and BTNF. For both of these reasons, plaintiffs ask the court to enjoin the federal defendants from going forward with the planned organized hunt of the bison on October 31, 1998 and order them to comply with the aforementioned federal statutes and regulations. The court will address each of plaintiffs' arguments in turn.

#### a. Alleged Violation of NWRSAA and NWRSIA

Plaintiffs allege that the FWS has violated the statute because it failed to conduct a compatibility study before implementing either the elk or the bison feeding programs. It is undisputed that the FWS did not conduct such a study. Because the court concludes that, pursuant to the statute, the FWS was not required to conduct a compatibility study with regards to the elk and/or bison feeding programs, plaintiffs' request for relief cannot be grounded on such an alleged violation.

The statute grants the Secretary of the Interior the authority to permit any "use" of a refuge area that is compatible with the major purposes for which the refuge was founded. *See* 16 U.S.C. § 668dd(d)(1)(A), (B). The statute gives examples of these "uses" which include hunting, fishing, public recreation and accommodation, and access, *see* 16 U.S.C. § 668dd(d)(1)(A), as well as easements for powerlines, telephone lines, canals, ditches, pipelines, and roads. *See* 16 U.S.C. § 668dd(d)(1)(B). Although it is clear that, while the listed "uses" are not meant to be all inclusive of the types of activities the Secretary may permit on a refuge, they do encompass a common ingredient. That is, they are all "uses" meant to be performed by third parties or the public. This definition of "use" is further bolstered by the fact that the statute specifically exempts from the compatibility requirement actions taken by "persons authorized to manage" the refuge area. *See* 16 U.S.C. § 668dd(c). Clearly, the setting out of feed lines for elk and bison on the NER is not the type of "use" contemplated by the statute as it is performed by

"persons authorized to manage" the NER. Since Congress has not spoken unambiguously with respect to whether "uses" include or exclude supplemental feeding programs conducted by persons charged with managing the NER, the court must "defer to the agency's interpretation if it represents a permissible construction of the statute." *See Aikens v. Shalala*, 956 F.Supp. 14, 17 (D.D.C.1997) (quoting *Consumer Federation of America and Public Citizen v. U.S. Dep't of Health and Human Services*, 83 F.3d 1497, 1503 (D.C.Cir.1996)). Accordingly, the FWS did not violate the NWRSAA or the NWRSIA by deciding that it was not required to procure a compatibility finding from the Secretary with respect to the supplemental feeding programs of the elk and bison on the NER.

### b. NEPA and CEQ Regulations

#### i. Statutory and Regulatory Framework

Plaintiffs also allege that defendants have violated NEPA and its implementing regulations promulgated by the Council on Environmental Quality (CEQ). One of NEPA's purposes is to assist public officials in understanding the environmental consequences of their actions. In that vein, NEPA requires that all federal agencies prepare a detailed statement with respect to any major federal action significantly affecting the quality of the human environment. *See* 42 U.S.C. § 4332(C). This includes circumstances where several separate actions may have a cumulatively significant effect on the environment. *See* 40 C.F.R. § 1508.27(b)(7). This statement is known as an Environmental Impact Statement (EIS). The EIS must describe (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented. *See* 42 U.S.C. § 4332(C)(i)–(iv). An agency, however, may avoid preparing an EIS if it

can demonstrate that the proposed action is a categorical exclusion. *See* 40 C.F.R. § 1508.4. If an agency cannot or does not invoke a categorical exclusion and concludes that the proposed action is not one that normally requires an EIS, then the agency must prepare an Environmental Assessment (EA) to determine whether an EIS is necessary. *See* 40 C.F.R. § 1501.4(b). Based on this EA, the agency shall determine whether an EIS is necessary. *See* 40 C.F.R. § 1501.4(c). If the agency determines, based on the EA, not to conduct an EIS, then it must issue a Finding Of No Significant Impact (FONSI) explaining why an action will have no significant impact on the environment. *See* 40 C.F.R. §§ 1501.4(e), 1508.13.

#### ii. Defendants' Failure to Include the Elk or Bison Feeding Programs in the EA

In the present case, federal defendants have concluded that an EA was required in conjunction with the bison management plan. The bison management plan contains several subparts dealing with size of the herd, methods of reducing the herd size, winter distribution of the bison, and disease management. Plaintiffs claim that defendants are in violation of NEPA because the bison management plan EA failed to properly consider the elk/bison feeding programs. Specifically, plaintiffs allege that the feeding programs are integral parts of a larger federal plan to manage the bison on and around the NER. Accordingly, plaintiffs posit that the feeding programs must be considered and evaluated in conjunction with the overall bison management plan in one EA. Defendants offer essentially two arguments to combat plaintiffs' claims. The court finds neither of these to be persuasive.

First, defendants claim that the USPS is under no obligation to comply with NEPA in this instance because the bison hunt is being conducted by the WGFD and not by a federal agency. This characterization, however, lacks any merit. It is undisputed that all of the federal defendants, along with the WGFD had a hand in developing the bison management plan that included this hunt. In fact, it was the WGFD that came to the federal defendants to seek their

help in developing a plan to manage the bison. Accordingly, having become so intimately involved in the discussion and planning of the hunt, the federal defendants cannot now claim to have no responsibility under NEPA with respect to the hunt or the supplemental feeding programs. *See Biderman v. Morton,* 497 F.2d 1141, 1147 (2nd Cir. 1974).

Having concluded that the federal defendants must comply with NEPA with respect to the bison management plan and the planned hunt, the court next addresses defendants' claim that they have, in fact, complied with the requirements of NEPA. Specifically, defendants put forth two reasons why they were not required to include in the bison management plan EA a finding with respect to the combined environmental impact of the elk and bison feeding programs and the bison management plan. First, defendants claim that the elk feeding program pre-dates the enactment of NEPA and, as such, is exempt from NEPA's requirements. Second, federal defendants claim that the elk and bison feeding programs are separate and distinct programs from the bison management plan and as such, need not be addressed pursuant to NEPA in the EA conducted on the bison management plan. The court cannot agree with either of defendants' positions.

■ As a threshold matter, it is clear that NEPA does apply to ongoing agency actions affecting wildlife and the environment, such as the elk and bison feeding programs. *See O'Neill v. United States,* 50 F.3d 677, 680–81 (9th Cir.1995); *Lee v. Resor,* 348 F.Supp. 389, 393 (M.D.Fla.1972); *Environmental Defense Fund Inc. v. Corps of Engineers of U.S. Army,* 324 F.Supp. 878, 881–82 (D.D.C. 1971). Importantly, it is inapposite whether such programs were begun before the enactment of NEPA. *See Lee,* 348 F.Supp. at 393; *Environmental Defense Fund,* 324 F.Supp. at 881–82. In order for NEPA to be effective, it is essential that all agency functions, where possible, comply with its mandates. *See Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission,* 449 F.2d 1109, 1114–18 (D.C.Cir.1971). Particularly, since Congress intended for compliance

with NEPA by federal agencies to be to the "fullest extent possible", each agency must examine its programs at "every stage where an overall balancing of environmental and non environmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs." *See id.* Moreover, the term "action" in the CEQ regulations implementing NEPA is defined as encompassing both "new and continuing activities." *See* 40 C.F.R. § 1508.18(a). Here, the FWS makes a decision every year whether to feed or not feed the elk, how much to feed them and where to place the feeding lines. Such action is "continuing" and does allow for a "balancing of environmental and non environmental factors" when the agency decides annually how that years' feeding program will progress. *See Calvert Cliffs',* 449 F.2d at 1114–18. Accordingly, it cannot be credibly argued that the elk supplemental feeding program does not lend itself to compliance with NEPA's environmental assessment requirements. Consequently, the court concludes that the fact that the elk feeding program pre-dated the enactment of NEPA does not excuse the FWS from including it in the bison management plan EA.

■ Defendants also argue that the elk and bison feeding programs are separate and distinct from the bison management plan and as such need not be considered in the bison management plan EA. However, defendants' own submissions, as well as the applicable law, lead the court to conclude otherwise.

■ If an agency is involved in several actions which, cumulatively, have a significant impact on the environment, then these actions should be considered in the same environmental document. *See* 40 C.F.R. § 1508.25(a)(2). Additionally, if agency actions are similar in that they share common timing or geography, such actions should also be addressed in the same environmental document so as to assess adequately their combined impacts. *See* 40 C.F.R. § 1508.25(a)(3). Importantly, an agency may not segment actions to unreasonably restrict the scope of the environmental review process. *See Foundation of Economic Trends v. Heckler,* 756 F.2d 143, 159 (D.C.Cir.1985).

In the current matter, it is undisputed that the elk feeding program, the bison feeding program and the bison management plan all take place in the same geographic area. It is equally evident from defendants' own submissions that the elk feeding program has a profound effect on the bison herd. *See* Jackson Bison Herd Long Term Management Plan at 35–38. In fact, it is undisputed that the final recommendations in the bison management plan admit that the elk feeding program will continue to be a factor to be considered in managing the bison. *See id.* Accordingly, all three of these actions, the elk feeding program, the bison feeding program and the bison management plan should have been considered together in the bison management plan EA so that the involved agencies could determine the combined impact of the programs. The record is clear that the EA submitted with the bison management plan does not consider the combined environmental impact of these three actions. Therefore, federal defendants are in violation of NEPA. *See Fund For Animals v. Espy,* 814 F.Supp. 142, 150–51 (D.D.C.1993). Applying the standard discussed earlier from *Motor Vehicle Manufacturers Ass'n,* the court concludes that defendants failure to abide by the strictures of NEPA renders their behavior arbitrary and capricious and in violation of the APA.

### 2. Irreparable Harm

█ Plaintiffs must next demonstrate that, should the court decide not to issue the injunctive relief they seek, plaintiffs would suffer an irreparable harm. *See Holiday Tours,* 559 F.2d at 842–44. In the present case plaintiffs have met this burden. Plaintiffs have shown two types of injuries, both of which would not be redressable without injunctive relief. First is the procedural injury caused by defendants' failure to comply with NEPA. Although such an injury cannot stand alone as the basis for a finding of irreparable harm, *see Fund For Animals v. Espy,* 814 F.Supp. 142, 151 n. 10 (D.D.C.1993), plaintiffs here have also demonstrated they would suffer other, concrete injuries should injunctive relief not be granted. The record shows that the individual plaintiffs live near and enjoy the bison in the GTNP, NER and BTNF. The individual plaintiffs enjoy observing,

photographing and generally commiserating with the animals. At least one of the individual plaintiffs has in the past traveled great distances to the GTNP, NER and BTNF for the purpose of observing and visiting with the bison and has stated an intent to continue to do so in the future. Accordingly, it is not unreasonable for these individuals to claim that seeing or even contemplating the type of treatment of the bison inherent in an organized hunt would cause them to suffer an aesthetic injury that is not compensable in money damages. *See id.* at 151. Accordingly, the combination of the injury suffered by plaintiffs due to federal defendants' procedural failure to comply with NEPA and the aesthetic injury the individual plaintiffs would suffer from seeing or contemplating the bison being killed in an organized hunt leads the court to conclude that the plaintiffs have carried their burden of demonstrating the presence of an irreparable harm should the court not grant injunctive relief. *See id.*

### 3. Substantial Harm to Other Interested Parties

█ The record in this case indicates that no other interested parties would suffer substantial harm should the court issue an injunction enjoining the federal defendants from going forward with their plan to reduce the bison herd. All of the supposed consequences that the federal defendants urge would occur should the bison hunt not go forward are speculative. First, the danger of the bison likely causing an outbreak of brucellosis is not supported by the record. Dr. Margaret Meyer, a respected expert in the field of veterinary public health and brucellosis infection who is familiar with the history and disease status of the Jackson Hole bison, states in her declaration that the risk of the bison herd infecting other livestock is "remote" and there is "virtually no risk" of infection to humans. *See* Declaration of Dr. Margaret Meyer, Ex. 9, Plaintiffs' Reply. Second, the safety issues outlined by defendants such as the bison moving onto roads and into populated areas are entirely speculative. Given the small number of animals that were scheduled to be taken in the bison hunt, the court cannot conclude that

having 35–40 "extra" bison in the herd will increase the already tolerable risks associated with the inevitable interplay between humans and bison that will occur so long as a bison herd of any size remains in this area. Consequently, the court concludes that other interested parties will not be subjected to substantial harm should the court issue the injunctive relief sought by plaintiffs.

### 4. Public Interest

■ The last hurdle that plaintiffs must clear before the court may issue injunctive relief is to demonstrate that such relief is in the public interest. The record in this case reveals at least two reasons showing that the public interest would be served by the court enjoining the federal defendants from going forward with the bison hunt. First, the public interest expressed by Congress' was frustrated by the federal defendants not complying with NEPA. Therefore, the public interest would be served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA, by complying with NEPA's requirements. *See Fund For Animals,* 814 F.Supp. at 152. Second, the public has a general interest in "the meticulous compliance with the law by public officials." *See id.* Therefore, after considering the totality of the circumstances and conducting a balancing the of the equities the court concludes that it is in the public interest for the court to issue the injunctive relief sought by plaintiffs.

### IV. Conclusion

For the reasons stated in this memorandum opinion, the court will grant the plaintiffs' request to enjoin the federal defendants from killing or otherwise allowing the destruction of bison pursuant to the bison management plan pending compliance by the federal defendants with NEPA. A separate order outlining the specific details of the injunction is being issued contemporaneously with this memorandum opinion.