**The FUND FOR ANIMALS, et al., Plaintiffs,**

v.

**Fran MAINELLA, et al., Defendants.**

**No. CIV.A. 03CV2475(RBW).**

United States District Court, District of Columbia.

Dec. 8, 2003.

Jonathan Russell Lovvorn, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Lauren Beth Fischer, U.S. Department of Justice, Washington, DC, for Defendants.

Barbara A. Miller, Birch, Horton, Bittner & Cherot, Washington, DC, for Intervenor Defendants.

Ellen Barney Balint, R.J. Hughes Justice Complex, Trenton, NJ, for Movant.

### MEMORANDUM OPINION

WALTON, District Judge.

On December 1, 2003, the plaintiffs [1] filed a motion for a temporary restraining order to prohibit a six-day black bear hunt that was authorized by the State of New Jersey to take place, *inter alia*, on federal land located in New Jersey commencing on December 8, 2003. Because part of the land on which the hunt is designated to be conducted is federal land, plaintiffs argue that the federal defendants, the Director of the National Park Service ("NPS") and the Secretary of the Department of the Interior ("DOI"),[2] had a duty to conduct an environmental analysis regarding the potential impact of the proposed hunt pursuant to several statutes, which they have failed to do. The Court convened an emergency hearing on December 5, 2003, at which time, due to the limited amount of time the Court had to review the pleadings and consider the several issues raised by the parties, it granted a temporary restraining order until it had the opportunity to review the merits of the plaintiffs' claims.[3] Having now had that opportunity, the Court concludes that plaintiffs are not entitled to injunctive relief.

### I. Factual Background

Black bears have inhabited New Jersey since very early in the state's history and

---

**1.** The plaintiffs include: The Fund for Animals, a national nonprofit membership organization headquartered in New York City that is "committed to preserving animal and plant species in their natural habitats ...." Complaint for Declaratory and Injunctive Relief filed on December 1, 2003 ("Compl.") ¶ 3; the Center for Animal Protection, a New Jersey based nonprofit policy, research, and educational organization devoted to addressing the "systemic, institutional use of animal life[,]" *id.* ¶ 10; the Humane Society of the United States, "a national animal protection organization with offices in Washington, D.C., and Gaithersburg, Maryland ... dedicated to protecting wild and domestic animals ... [,]" *id.* ¶ 15; Santos Hawk's Blood, "a member of the Chiricahua Apache Nation and the Lone Warrior Society, an organization of Native people created to protect and defend Native people's rights, as well as those of the 'Shosh' or bear, which they call the four-legged people[,]" *id.* ¶ 20; Steve Embers, "a lifelong resident of New Jersey" who "has been leading group hikes and other outings in the Recreation Area on behalf of the New Jersey Chapter of the Sierra Club since 1988[,]" *id.* ¶¶ 26, 27; Jack Detalvo, a resident of New Jersey and a member of the National Rifle Association, *id.* ¶ 31; Donald Cunnius, a resident of Setauket, New York, who owns a house near to the Recreation Area and regularly visits that area, *id.* ¶ 35; and "Kimberly M. Lucci, a resident of Bridgewater, New Jersey, and an avid hiker, naturalist, wildlife and bird watcher, and amateur wildlife and nature photographer." *Id.* ¶ 39.

**2.** The named defendants are Fran Mainella, the Director of the National Park Service, and Gale Norton, the Secretary of the Interior, who maintains ultimate responsibility for ensuring that agencies within the Department of the Interior, which includes the Park Service, comply with all applicable regulatory statutes. At the hearing held on December 5, 2003, the Court granted the motions of the New Jersey Deputy Attorney General, on behalf of the New Jersey Fish and Game Council, the Safari Club International and Safari Club International Foundation, and the U.S. Sportsmen's Alliance Foundation, the New Jersey Federation of Sportsmen's Clubs and Frank Dara, to permissively intervene in this matter. The intervention requests were not opposed by plaintiffs or defendants.

**3.** The Court informed the parties that a decision regarding whether it would extend the temporary restraining order would be issued by 10:30 a.m. on Tuesday, December 9, 2003.

have "[l]ong [been] considered a threat and a nuisance to development . . . ." Compl. ¶ 69.[4] In 1954, New Jersey reclassified the black bear as a "game mammal," which exposed the animal to sport hunting. *Id.* ¶ 70. By 1971, the black bear population had been reduced to less than 25 animals, prompting the State of New Jersey to ban the hunting of the species. *Id.* However, after a 32 year proscription against hunting the black bear, in 2003 the State of New Jersey decided to reinitiate black bear sport hunting. *Id.* ¶ 71. The State decided to conduct part of this year's hunt in the New Jersey unit of the Delaware Water Gap National Recreation Area (the "Recreation Area"), an area that was designated by Congress as a unit of the National Park System in 1965. *Id.* ¶ 49 (citing 16 U.S.C. § 460o).[5] According to plaintiffs, New Jersey's decision to conduct the bear hunt is premised on the State's faulty assessment that the black bear population has increased to more than 3,200 bears since 1997, which would constitute a 500 percent increase in the past six years. *Id.*

Plaintiff, the Fund for Animals, alleges that it was not until November 14, 2003, that it learned that the planned 2003 New Jersey bear hunt would not be limited to state and private lands in New Jersey, but would include the federal lands of the Recreation Center. *Id.* ¶ 82.[6] Plaintiffs state that on November 24, 2003, John Donahue, the Superintendent of the Delaware Water Gap National Recreation Area, presided over a meeting of the congressionally created Advisory Commission for the Recreation Area, during which a debate concerning the hunt was conducted. *Id.* ¶ 87. During the November 24 meeting, Mr. Donahue allegedly stated that a decision regarding whether or not to postpone the hunt would be made during the week of December 1, 2003, one week prior to the scheduled commencement of the bear hunt. *Id.* ¶ 88. Although plaintiffs state that Mr. Donahue "expressed a willingness to work with plaintiffs towards a resolution of their concerns," they state that he "noted that it was unlikely that the NPS would postpone this year's hunt." *Id.* ¶ 89.

In a three—count complaint,[7] plaintiffs

4. References to "Compl." are to the plaintiffs' complaint for Declaratory and Injunctive Relief filed on December 1, 2003.

5. The Recreation Area is located in the northwestern part of New Jersey and according to plaintiffs is comprised of over "67,000 acres of park land protecting nationally significant biological and cultural resources, including 130 species of rare, threatened, and endangered birds, mammals, and plants; one of the last free-flowing rivers in the Eastern United States; and the most significant concentration of archeological resources in the Northwestern United States." Compl. ¶ 49. (citations omitted). According to plaintiffs, this area is also home to several "federally listed endangered and threatened species," such as the Bog Turtle, the Small Whorled Pagonia, and the Bald Eagle. *Id.* ¶ 50.

6. The Fund for Animals alleges that it submitted a request pursuant to the Freedom of Information Act for the production of records concerning bear hunting in the park, which

has not been responded to. Compl. ¶ 82. However, at oral argument, counsel for the State of New Jersey demonstrated that the regulation authorizing the hunt, which was issued on July 11, 2003, clearly delineated that the federal land was encompassed within the boundaries of the hunt. And when counsel for the state represented what the boundaries were for the hunt as reflected in the regulation, counsel for plaintiffs did not contend that the information was unavailable to them. The Court therefore considers the timing of the filing of this action—only days before the hunt was scheduled to commence—troubling, especially since it is inconceivable that plaintiffs did not know that a delay in initiating the hunt could effectively stop it from occurring since, according to defendants, most, if not all, of the bears will have started their hibernation cycle by the time the designated hunting period is over.

7. Plaintiffs also allege that defendants have violated the Endangered Species Act ("ESA")

seek a ruling from the Court that the defendants have violated the Administrative Procedure Act ("APA") by acting in a manner that is arbitrary, capricious and not in accordance with law. 5 U.S.C. § 706. Specifically, plaintiffs allege (1) that the defendants have violated the Delaware Gap Enabling Act ("DGEA"), 16 U.S.C. § 460o–5, by authorizing bear hunting within the Recreation Area without first promulgating hunting regulations as required by that Act; (2) that defendants have violated the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.*, and the NPS's internal, binding management policies by authorizing the bear hunt without ensuring that such hunting will not impair park resources or result in the "wanton destruction" of park wildlife; and (3) that defendants have violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331(2)(C), by authorizing the bear hunt without preparing required NEPA documents. Plaintiffs also seek an order directing the defendants to comply with their statutory duties and to preliminarily and permanently enjoin the defendants from authorizing black bear hunting until such time as the agency and the Secretary have complied will all applicable federal laws and regulations.

## II. Analysis

In determining whether plaintiffs are entitled to further injunctive relief, the Court must employ this Circuit's familiar four-prong test, which requires the Court to evaluate (1) whether plaintiffs have demonstrated that there is a substantial likelihood that they will prevail on the merits of one of their claims; (2) whether plaintiffs have shown that they will sustain irreparable harm if injunctive relief is not awarded; (3) whether the issuance of injunctive relief will not "substantially harm" the other parties; and (4) whether awarding the relief is in the public interest. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977) (citing *Virginia Petroleum Jobbers Assoc. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)).

### 1. Likelihood of Success on the Merits

Plaintiffs argue that they can demonstrate a likelihood of success on the merits because they can show that the defendants have acted arbitrarily and capriciously and not in accordance with law, in violation of the APA, 5 U.S.C. § 706, as to each of their claims.[8] Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Pls.' Mem.") at 21.

### A. Defendants' Alleged Violation of the Delaware Gap Enabling Act

First, regarding the DGEA, plaintiffs argue that the defendants have failed to promulgate hunting regulations as required by the DGEA. The applicable provision of the DGEA provides, in relevant part:

> The Secretary of the Interior *shall* permit hunting and fishing on lands and waters under his jurisdiction . . . in accordance with the applicable laws and regulations of the States . . . . The Secretary of the Interior may designate zones where, and establish periods when, no hunting shall be permitted for

which requires agencies to prepare a "biological assessment" evaluating the potential effects of an action on a species enumerated in the Act. Compl. ¶ 65. Pursuant to ESA, plaintiffs filed notice with the defendants of a potential ESA violation on November 21, 2003. Plaintiffs have advised the Court of their intent to amend their complaint on or before January 21, 2004, to include a cause of action under the ESA. Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Pls.' Mem.") at 2 n. 1.

8. Because the statutes at issue do not provide private causes of action, the plaintiffs have brought this action under the APA.

reasons of public safety, wildlife management, administration, or public use and enjoyment not compatible with hunting, and may, in his plan for the area, provide areas for intensive fish and wildlife management, including public hunting and fishing, and shall issue appropriate regulations after consultation with appropriate officials of the States concerned.

16 U.S.C. § 460o–5 (emphasis added). Plaintiffs argue that this provision mandates that the Secretary promulgate regulations before hunting can commence. They rely on *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417 (9th Cir. 1989), for the proposition that the Secretary of the DOI is required, pursuant to section 460o–5, to promulgate regulations concerning black bear hunting. In *Lyng*, plaintiffs argued that the Secretary of the Department of Agriculture had violated the Hells Canyon National Recreation Area Act ("HCNRA") by approving a timber sale without first "promulgat[ing] regulations governing when, where, and how certain activities, including timber harvesting, may occur in the HCNRA." 882 F.2d at 1425. The HCNRA's relevant statutory language provided that " '[t]he Secretary *shall* promulgate … such rules and regulations as he deems necessary to accomplish the purposes … of this title.' " *Id.* at 1426 (quoting 16 U.S.C. § 460gg–7) (emphasis added). In reversing the district court's conclusion that this language did not require the Secretary to promulgate rules and regulations, the *Lyng* court held that, in the absence of regulations addressing the specific activity at issue, "[t]he language and legislative history of section 10 clearly reveal an intent to create a mandatory duty to promulgate regulations in the specified categories." *Id.* Rejecting the district court's conclusion that the language of the statute gave the Secretary discretion regarding whether to issue regulations, the court stated that "[i]n both

the first and second sentences of section 10 the predicate nominative of the word 'shall' is 'rules and regulations': 'shall' describes the Secretary's relationship to the regulations." *Id.* at 1427 (citation omitted).

In opposition, defendants argue that they had no duty to promulgate regulations here because in accordance with a plain reading of the statute, regulations must only be promulgated when there are limitations placed on hunting. Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Defs.Opp'n") at 10. In other words, defendants posit that it is only "[w]hen the Secretary exercises her discretionary authority to [impose] such limitations[ ] … [that] the Enabling Act directs that the Secretary 'shall issue appropriate regulations after consultation with appropriate officials of the States concerned.' " *Id.* at 11 (quoting 16 U.S.C. § 460o–5). Because the NPS "has not exercised its discretion to restrict hunting or to allow intensive management … [,]" defendants contend that regulations did not have to be promulgated. *Id.* Defendants submit that their interpretation of the DGEA is bolstered by the NPS's general hunting regulations, which provide that hunting "shall be allowed in park areas where such activity is specifically mandated by Federal statutory law[,]" and further provide that " '[h]unting may be allowed in park areas where such activity is specifically authorized as discretionary under Federal statutory law …. Such hunting shall be allowed pursuant to special regulations.' " *Id.* at 12 (quoting 36 C.F.R. § 2.2). Moreover, defendants opine that because the NPS is the agency charged with administering the statute, its interpretation that the Enabling Act only requires regulations "when the Secretary exercises discretion to restrict hunting or authorize intensive fishing and hunting[,]" should be accorded considerable deference pursuant to *Chev-*

*ron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* at 13–14.

The Supreme Court has directed that a court reviewing "an agency's construction of the statute which it administers ... is confronted with two questions." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The first is whether or not "Congress has directly spoken to the precise question at issue[,]" because, if Congress has spoken on the issue, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. On the other hand, if the court concludes that the statute is ambiguous and Congress has not clearly expressed its intention, the court may not "simply impose its own construction on the statute .... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778; *see also Secretary of Labor, Mine Safety & Health Admin. v. Excel Mining,* LLC, 334 F.3d 1, 6 (D.C.Cir.2003) (Court must defer to Secretary's "interpretation unless it is plainly erroneous or inconsistent with the [statute].") (citation and internal quotation marks omitted).

■ In this case, the Court need not reach the second *Chevron* question because it concludes that the statutory language is unambiguous and clearly supports the Secretary's conclusion that she need only promulgate regulations if she exercises her discretion to place limitations on hunting or has "provid[ed] areas for intensive fish and wildlife management ...." 16 U.S.C. § 460o–5. Interpreting the language in the manner advocated by plaintiffs would render use of the word "may" in the first clause of the second sentence completely meaningless. *Lewis v. Barnhart,* 285 F.3d 1329, 1332 (11th Cir.2002)

("[I]t is an elementary principle of statutory construction that, in construing a statute, we must give meaning to all the words in the statute.'") (citations omitted). Rather, a common sense reading of the statute supports the conclusion that it is only when the Secretary decides to exercise her discretion to place limitations on hunting or to "provide areas for intensive fish and wildlife management," that the duty to promulgate regulations arises. Thus, the statutory provision here is distinguishable from the language found to mandate the issuance of regulations in *Lyng.* The language of the statute at issue in *Lyng* provided that " '[t]he Secretary *shall* promulgate ... such rules and regulations as he deems necessary to accomplish the purposes ... of this title.' " 882 F.2d at 1426 (quoting 16 U.S.C. § 460gg–7). Here, the duty to promulgate regulations is contained at the end of a clause describing situations when the Secretary *may* prohibit hunting or provide areas for intensive fish and wildlife management. Reading the statute in the manner urged by plaintiffs would render meaningless the Secretary's discretion to "designate zones where and establish periods when, no hunting shall be permitted ..." and to "provide areas for intensive fish and wildlife management ...." 16 U.S.C. § 460o–5. In other words, if regulations must always be adopted, there was no need for Congress to grant the Secretary discretion to do these things. This was clearly not Congress' intent.

Perhaps foreseeing this inevitable interpretation of the provision, plaintiffs, in their reply, argue that the Secretary has in fact placed restrictions on hunting and thus has triggered her duty under the statute to promulgate regulations. Plaintiffs' Reply in Support of Motion for a Temporary Restraining Order ("Pls.' Reply") at 6. As support for this argument, plaintiffs have attached a document from

the NPS' website that contains generic "Recreation Area Regulations" that impose restrictions on the manner in which hunting can be conducted and locations within the Recreation Area where hunting is prohibited. *See* Pls.' Reply, Supplemental Exhibit ("Supp.Ex.") 3. Defendants submitted at oral argument[9] that these regulations were not specially issued for this hunt but are general regulations concerning hunting in the park.

A review of the regulations at issue reveal that they do impose limitations on hunting in general, which arguably would be applicable to the specific black bear hunt. However, these regulations were in existence prior to the announcement of the specific hunt at issue, and thus cannot be said to specifically limit the hunt of the black bear. Furthermore, as the Court interprets the DGEA, the promulgation of regulations are required when there is *no* hunting permitted or when the Secretary has "provide[d] areas for intensive fish and wildlife management," which is logical given the first sentence of the Act, which states that hunting "shall" be permitted. As the Court construes the statute, the need for regulations was included to ensure that inappropriate prohibitions on the right to hunt are not imposed and that, when the Secretary designates areas "for intensive fish and wildlife management," that such areas are appropriately regulated. The Secretary has not taken either action in this case. Furthermore, if the DWEA requires the adoption of regulations and this has not occurred, the omission cannot result in the prohibition of hunting because the Act expressly requires that hunting be permitted. Rather, failure to promulgate the regulations would invalidate the Secretary's *limitations* on the right to hunt or her designation of "areas for intensive fish and wildlife management[.]" For these reasons, the Court concludes that plaintiffs have not shown a likelihood of success on the merits of their claim that the Enabling Act required that the Secretary promulgate regulations concerning the hunting of black bears.

**B. Defendants' Alleged Violation of the Park Service Organic Act and NPS Management Policies**

Plaintiffs next claim is that the NPS "has also neglected to address its obligations under the National Park Service Organic Act, 16 U.S.C. § 1 (the "Organic Act"), and the NPS's binding Management Policies." Pls. Mem. at 26. 16 U.S.C. § 1 provides that the NPS

> shall promote and regulate the use of the Federal areas known as national parks ... by such means and measures as conform to the fundamental purpose of said parks ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.[10]

Plaintiffs argue that there is no evidence that defendants have even attempted to comply with the mandates of the Organic

---

**9.** Plaintiffs did not make this argument in their initial papers before the Court, therefore, the defendants did not have the opportunity to address this argument in their papers.

**10.** Plaintiffs also point to section 22 of the Organic Act, which provides that the Secretary of the DOI "shall provide against the wanton destruction of the fish and game found within the park, and against their capture or destruction ...." 16 U.S.C. § 22. However, it appears that this provision applies solely to the Yellowstone National Park, and plaintiffs make no representation that the Recreation Area comprises part of the Yellowstone National Park. Defendants concur that this provision is not applicable to the present controversy. Defs.' Opp'n at 6.

Act and thus, plaintiffs have established a likelihood of success pertaining to their argument that the defendants have violated the Organic Act.[11] In opposition, defendants argue that permitting hunting to take place that complies with state and federal laws does not violate the Organic Act because "Congress has directly and specifically provided for the activity in the [Delaware Water Gap Act]'s enabling legislation." Defs.' Opp'n at 17. Thus, they contend that "[b]ecause the Enabling Act specifically mandates hunting at the [Recreation Area], hunting cannot be considered a violation of the Organic Act." *Id.* at 19 (citation omitted).

 The Court is unable to discern, and plaintiffs have failed to establish, exactly what obligations the Organic Act places on defendants and why, if such obligations exist, they override the Enabling Act, which specifically mandates that hunting "shall" be permitted. 16 U.S.C. § 460o–5. While the NPS has the duty to "promote and regulate the use of the ... national parks," 16 U.S.C. § 1, the plaintiffs have failed to demonstrate exactly how the defendants have failed to adhere to this obligation. Clearly, the Organic Act, unlike NEPA, does not impose any obligatory reporting requirements. Plaintiffs' argument is similar to the argument they made in *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 11–12 (D.D.C.1998), and that was rejected by that court. There, plaintiffs argued that the United States Fish and Wildlife Service ("FWS") had violated the National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. § 668dd *et seq.*, by "fail[ing] to conduct a compatibility study before implementing ... [its] elk or ... bison feeding programs." *Id.* at 11. The statute at issue "grant[ed] the Secretary of the [DOI] the authority to permit any 'use' of a refuge area that is compatible with the major purposes for which the refuge was founded." *Id.* (quoting 16 U.S.C. § 668dd(d)(1)(A), (B)). In concluding that this language did not impose an affirmative duty on the Secretary to conduct a compatibility study of the proposed program, the court stated that the Secretary's feeding program was not a "use" as envisioned by the statute and, because Congress had not explicitly determined "whether 'uses' included or exclude supplemental feeding programs conducted by persons charged with managing the [National Elk Refuge]," the court deferred to the agency's reasonable interpretation of the term, which did not require the FWS

---

11. Plaintiffs also pointed to the NPS's internal Management Policies, which they argue "are binding and judicially enforceable." Pls.' Mem. at 27. Specifically, they reference § 4.4.3 of the Management Policies, which provides that "[p]ublic harvesting of designated species of plants and animals ...." will only be permitted when "the Service has determined that the harvesting will not unacceptably impact park resources or natural processes, including the natural distributions, densities, age-class distributions, and behavior of: Harvested species ...." Pls.' Mem., Ex. 5 (NPS Management Policies) at 36. However, plaintiffs appear to have abandoned their argument that the NPS has failed to adhere to its own regulations as they do not respond to the defendants' challenge to this position in their reply brief, nor did they respond to the challenge at oral argument. Accordingly, the Court deems that the argument has been conceded. *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C.2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citation omitted); *Bancoult v. McNamara*, 227 F.Supp.2d 144, 149 (D.D.C.2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.")

to obtain a compatibility finding from the Secretary. *Id.* at 12.

While not directly analogous to the current situation, the court in *Clark,* like the situation here, was confronted with a statute that, while granting general authority to the NPS to manage and conserve the national parks, is silent as to whether the NPS has a duty to conduct an impact study of a proposed hunt, notably a hunt that is being conducted by a third party, not the agency itself. The Court defers to the agency's view that permitting hunting to occur in the Recreation Area 'does not violate the Organic Act, as it is an activity clearly permitted by the Enabling Act. Furthermore, in this case, the defendants represented to the Court that they reviewed the New Jersey plan for the limited six-day hunt and decided not to take any action to prohibit or limit the hunt. Accordingly, because the Court credits the defendants' representations that the agency evaluated the proposed impact of the state's actions, and concludes that the NPS had no statutory obligation to conduct a formal impact study, the Court finds that plaintiffs have not established a likelihood of success on their argument that the defendants have violated the Organic Act.

**C. Defendants' Alleged Violation of the NEPA**

Finally, plaintiffs argue that the NPS has failed to comply with the NEPA, which requires "federal agencies to take a 'hard look' at the environmental consequences of their actions, as well as reasonable alternatives to them." Pls.' Mem. at 30 (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). Specifically, plaintiffs contend that the NPS has failed to prepare an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA"), or to conduct any NEPA analysis concerning the potential environmental impact of its decision authorizing black bear hunting and has not provided public disclosure regarding the environmental effects of its decision.[12]

While not contesting plaintiffs' assertions about the requirements of the NEPA, defendants posit that pursuant to the statute's "plain language ... NEPA requires an impact statement only when there is a 'major *Federal action.*'" Defs.' Opp'n at 14 (quoting NEPA, 42 U.S.C. § 4331(2)(C)). The duties that arise pursuant to the NEPA have not been triggered in this situation, defendants argue, because "the Park Service decided not to act under its discretionary authority to restrict hunting and thus there was no proposal to act.... Here, the State of New Jersey, not the Federal Defendant, may or may not choose to permit hunting of bears within their borders." Defs.' Opp'n at 16.

In support of their argument, defendants rely on *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1243–44 (D.C.Cir. 1980). There, "the Alaska Department of Fish and Game (ADFG) [had] announced a program whose aim was to kill from air-

---

12. Plaintiffs assert that NPS' failure to provide any documentation regarding the potential environmental impact of its decision to permit black bear hunting is particularly detrimental in light of the fact that the "State of New Jersey has also chosen not to prepare any environmental impact analysis of its own." Pls.' Mem. at 31. However, this assertion is belied by the New Jersey Fish and Game Council regulation authorizing the hunt. *See* 35 N.J. Reg. 4053(a) (Sept. 2, 2003) (discussing result of recent bear research and justifications for authorizing the hunt); *see also* New Jersey Fish and Game Council's Motion to Intervene and in Opposition to Motion for Temporary Restraining Order or Other Preliminary Injunction ("NJFGC's Opp'n") at 6 ("NJFGC's decision to re-institute a limited bear hunting season is the result of extensive scientific study and research by NJFGC staff biologists as well as an independent panel of biologists.").

craft 170 wolves . . . in an area of 35,000 square miles in the interior part of the state. Many, perhaps most, of the wolves were to be killed on federal lands for which the Department of the Interior [was] responsible." *Id.* at 1240. Plaintiffs, "organizations and individuals interested in the preservation of the environment in general and of wildlife in particular[,]" argued that the Secretary and Department of Interior officials had violated the Federal Land Policy and Management Act (FLPMA) as well as the NEPA, by failing "to prepare an environmental impact statement before deciding not to prevent Alaska from killing wolves on Federal land." *Id.* In holding that the defendants were not required to prepare an environmental impact statement, the Circuit Court noted that it was "the Secretary's inaction which [was] complained of." *Id.* at 1243. Thus, because the "NEPA only refers to decisions which the agency anticipates will lead to actions[,]" the court held that it is "only when an agency reaches the point in its deliberations when it is ready to propose a course of action need it be ready to produce an impact statement." *Id.* The court reasoned that it is "[l]ogical[ ], then, if the agency decides not to act, and thus not to present a proposal to act, the agency never reaches a point at which it need to prepare an impact statement." *Id.* at 1243–44. Accordingly, the court held that where there is not "specific[ ] federal action" the NEPA's requirements are not triggered. *Id.* at 1244. Consistent with this reasoning, the court concluded that "federal 'approval' of another party's action does not make that action federal unless the federal government undertakes some 'overt act' in furtherance of that other party's project." *Id.*

Plaintiffs respond that *Andrus* is inapplicable here for several reasons. First, they argue that "the federal land management statute at issue in *Andrus* . . . specifically granted the state authority to man-

age wildlife without federal approval . . . [,]" whereas the Organic Act and the Recreation's Enabling Act do not provide this authority to the state. Pls.' Reply at 9 n. 6. Even assuming the accuracy of this proposition, it does not demonstrate how the defendants have acted *in this instance.* While the Secretary could have acted to prohibit the hunt, she did not. Plaintiffs argue, however, that "the NPS is intimately involved in the planning and administration of a bear hunt in a National Recreation Area[,]" *id.* at 3, and this amounts to federal action. However, none of the documents relied upon by plaintiffs support this assertion.

First, plaintiffs reference a document entitled "Resource Management Plan[,]" which was recommended for adoption by the Recreation Area's superintendent on March 22, 1994, and approved on April 4, 1994; the document was last updated on February 9, 1998. Defs.' Opp'n, Ex. 9. This document does nothing to advance plaintiffs' position because, at most, it demonstrates that the NPS has assisted the State of New Jersey in collecting data for annual *deer* hunting. *See id.* at 2 ("NPS personnel assist in collection of data that are published in New Jersey's annual *deer* report.") (emphasis added). It therefore has nothing to do with the current black bear hunt. Plaintiffs also point the defendants' General Management Plan, quoting a sentence from the plan which states that "[f]ish and wildlife in the national recreation area will continue to be managed as a cooperative endeavor with the states." Defs.' Ex. 2 at 23. Despite this corroborative agreement, it does not alone demonstrate that the defendants expressly approved the hunt, or have acted in concert with the State in preparation for the hunt, or will do so during the actual hunt of the black bear. Thus, this case is distinguishable from the case relied on so heavily by plaintiffs, *Fund for Animals v.*

*Mainella*, 283 F.Supp.2d 418 (D.Mass. 2003). There, the court had before it an administrative record [that] reveal[ed] that NPS [made] a 'substantial contribution of personnel and equipment' . . . to the management of the Seashore's hunting program. The superintendent determines the areas where hunting occurs and the Commonwealth determines the open season. In the words of the [General Management Plan], NPS shares management of the Seashore with the Commonwealth.

*Id.* at 432 (citation omitted).[13] *See also Fund for Animals v. Clark*, 27 F.Supp.2d 8, 12–13 (D.D.C.1998) (in concluding that defendants had violated NEPA, the court noted that "[i]t is undisputed that all of the federal defendants . . . had a hand in developing the bison management plan that included this hunt. . . . [H]aving become so intimately involved in the discussion and planning of the hunt, the federal defendants cannot now claim to have no responsibility under NEPA with respect to the hunt or the supplemental feeding programs.") (citation omitted).

■ In the case currently before the Court, unlike the *Mainella* and *Clark* cases, plaintiffs have failed to designate even one overt act that the federal defendants have taken regarding the black bear hunt. Rather the existing record demonstrates that the hunt was planned and is being conducted by the State of New Jersey, even though it will be partially conducted on federal lands. The lesson of *Defenders of Wildlife* is that the Secretary's failure to exercise her discretion to prohibit the hunt is not federal action, which is needed to trigger the duty to prepare an environmental impact statement under the NEPA. Therefore, on the facts currently before the Court, it concludes that plaintiffs have failed to demonstrate a likelihood of success on their NEPA claim.

Having concluded that the plaintiffs have failed to establish a likelihood of success on the merits of any of their claims, the Court need not discuss in great detail the remaining factors for injunctive relief. *See Adair v. England*, 217 F.Supp.2d 1, 3 n. 6 (D.D.C.2002) ("a party moving for injunctive relief must make a showing on *all four factors* to prevail but the strength of the showing can vary on each factor."). However, a brief discussion of the remaining factors will be provided.

## 2. Irreparable Harm

■ Having concluded that plaintiffs have not established that the federal defendants have violated any of their statutory obligations, the Court is hard-pressed to conclude that plaintiffs have established irreparable injury in this case. Thus, while it is true that "[c]ourts have not hesitated to enjoin an agency action that was taken in violation of NEPA[,]" Pls.' Mem. at 36 (quoting *Greater Yellowstone Coalition v. Bosworth*, 209 F.Supp.2d 156, 163 (D.D.C.2002)), in this instance, the Court has not found that plaintiffs have established any statutory violations. Therefore, while it is apparent that the harm plaintiffs allege—loss of wildlife—cannot be reconstituted if the proposed hunt is permitted to occur, *see Clark*, 27 F.Supp.2d at 14 ("seeing or even contemplating the type of treatment of the bison inherent in an organized hunt would cause

---

**13.** Also notable in the *Mainella* case is the fact that the NPS did not argue that it was not responsible for the hunting program at issue. Rather, this argument was made by the defendant-intervenors. 283 F.Supp.2d at 431. Furthermore, the court's decision was in the context of a ruling on the plaintiffs' motion for summary judgment; the court had previously denied the plaintiffs injunctive relief "on the ground that [p]laintiffs, who sued at the last minute, had not demonstrated irreparable harm." *Id.* at 422–23 n. 2.

[the plaintiffs] to suffer an aesthetic injury that is not compensable in money damages.") (citation omitted), it is equally clear that injunctive relief for such injury has been found only when it exists in conjunction with a statutory violation. *See id.* (noting that plaintiffs had also demonstrated a "procedural injury caused by defendants' failure to comply with NEPA."); *Fund for Animals v. Norton,* 281 F.Supp.2d 209, 222 (D.D.C.2003) ("[T]he procedural harm arising from a NEPA violation, is insufficient, *standing alone,* to constitute irreparable harm justifying issuance of a preliminary injunction, [however,] *when combined* with the irreparable aesthetic injuries alleged by plaintiffs, such procedural harm does bolster plaintiffs' case for a preliminary injunction.") (citations omitted) (emphasis in original and emphasis added).

Moreover, it is also significant that the limited [14] six-day hunt is not designed to eradicate or even significantly reduce the black bear population. As defendants note, "[c]ontrary to [p]laintiffs' alarmist predictions, the black bear population at the [Recreation Area] is not going to be decimated, or even significantly impacted, by this bear hunt." Defs'. Opp'n at 22. Thus, "plaintiffs' aesthetic, spiritual, and cultural interests in observing, photographing, studying, and appreciating bears in the Recreation Area ..." Pls.' Mem. at 38, will not be irreparably injured. *See Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C.Cir.1975) (Rejecting the plaintiffs' "extreme contention that the loss of only one bird [was] sufficient injury to warrant a preliminary injunction; rather, a proponent of such an injunction must raise a substantial possibility that the harvest of excessive numbers of [the species at issue] will irretrievably damage the species. To equate the death of a small percentage of a reasonably abundant game species with irreparable injury without any attempt to show that the well-being of that species may be jeopardized is to ignore the plain meaning of the word."); *Fund for Animals v. Babbitt,* 2 F.Supp.2d 562, 566–67 (D.Vt. 1996) (stating that it was "questionable as to whether any of the named plaintiffs [would] suffer any injury as a result of the hunt[,]" where "[t]he plaintiffs [had] presented virtually no concrete evidence to support their contention that their ability to view or photograph moose [would] be impaired as a result of the proposed limited hunt."); *Southern Utah Wilderness Alliance v. Thompson,* 811 F.Supp. 635, 642 (D.Utah 1993) (holding that plaintiffs failed to establish that they would suffer irreparable injury since "the coyote population [would] remain viable.... This is not to say that the injuries [p]laintiffs assert are not real, but rather that this court finds that the injury is not irreparable."). Therefore, having concluded that the plaintiffs have not established a likelihood that they can demonstrate that the defendants have violated any of their statutory obligations, the Court holds that plaintiffs have failed to demonstrate that they will suffer irreparable harm if the hunt is permitted to occur.

### 3. Harm to Other Parties

■ Plaintiffs argue that no other parties would be harmed by the issuance of a temporary restraining order, as the order would merely preserve the status quo. Defendants counter that the State of New Jersey and members of the hunting public would be harmed by an issuance of a temporary restraining order, as "[t]he State has already undertaken considerable effort on behalf of the bear hunt." Defs.' Opp'n

---

14. Defendants represented without challenge that many of the bears, especially female bears who are pregnant, are already in hibernation and therefore will not likely be affected by the hunt.

at 22. In addition, the New Jersey Fish and Game Council notes that there have been increasingly more aggressive encounters between black bears and humans. For example, it proffers the results of a recent report that indicates that between 1995 and 2001 the number of incidents where damage to property was caused by bears has increased from 48 to 131; the number of bears killed by vehicles has increased from 15 to 52; the number of bear sightings has increased from 43 to 474; and the home ranges of the bears, *i.e.*, the areas they occupy, has increased from 1,495 to 2,643 square miles. New Jersey Fish and Game Council's Motion to Intervene and in Opposition to Motion for Temporary Restraining Order or Other Preliminary Injunction ("NJFGC's Opp'n") at 16. Moreover, the State represents that in 2002, the New Jersey Department of Environmental Protection ("DEP") received "more than fourteen hundred complaint calls" regarding black bears, compared to 285 complaints received in 1995. *Id.* Notably, as recently as June 20, 2003, a two-year old boy was "swat ... [on]" the head by a black bear as he sat on the front porch of his home. *Id.* at 18. In addition to this data, hunters, who are represented in this lawsuit by several organizations that were permitted to intervene in this matter, will be deprived of their opportunity to hunt these bears because hibernation has already begun. Given the State of New Jersey's research on this issue and the fact that the hunt will only be feasible for a limited time due to the start of the bears' hibernation cycle, which commenced at the beginning of December, the Court concludes that other parties would suffer harm if further injunctive relief is granted.

### 4. The Public Interest

■ While typically the public interest favors the enforcement of the federal de-

fendants' statutory obligations, *see, e.g., Bracco Diagnostics, Inc. v. Shalala,* 963 F.Supp. 20, (D.D.C.1997) ("[T]he Court concludes that the public interest is better served by issuing an injunction that will assure that the [federal agency] meets its statutory obligations."), having concluded in this situation that the federal defendants have not violated their statutory obligations, the Court finds that the public interest favors permitting the State of New Jersey to conduct its limited hunt in order to manage its wildlife resources and hopefully promote a healthy and safe habitat for the residents who live in the vicinity of the Recreation Area as well as for the black bears.

### III. Conclusion

Because the Court concludes that plaintiffs have failed to satisfy their burden of demonstrating that they are entitled to injunctive relief, the Court declines to further extend the emergency injunction it entered to give it the opportunity to examine whether further injunctive relief was warranted. Accordingly, the Court permits the State of New Jersey to proceed with its authorized hunt of the black bear forthwith.

**SO ORDERED** on this 8th day of December, 2003.[15]

### *ORDER*

In accordance with the Court's Memorandum Opinion, it is hereby

**ORDERED** that the Court's prior order is vacated. It is further

**ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order is denied.

---

15. An order consistent with the Court's ruling accompanies this Memorandum Opinion.